972 F.2d 258
 70 A.F.T.R.2d 92-5030, Unempl.Ins.Rep. (CCH) P 22,060
 INLANDBOATMEN'S UNION OF THE PACIFIC NATIONAL HEALTH BENEFIT
TRUST; Ken Ghovik; Burrill Hatch; Frank Briglia; Jerry
Dowd; Jim Dunnigan; Elton Ellert; John Gouveia; Warner
Nelson; John Perryman; Richard Palmer, Trustees of the
Inlandboatmen's Union of the Pacific National Health Benefit
Trust, Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 91-35073.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 6, 1992.
Decided June 5, 1992.
As Amended on Denial of Rehearing
Sept. 1, 1992.
 Suggestion for Rehearing En Banc
Rejected Sept. 1, 1992.
 
 Fred T. Hanna, Brownstein, Rask, Sweeney, Kerr, Grim & DeSylvia, Portland, Or., for plaintiffs-appellants.
 Gary R. Allen, and Teresa T. Milton, Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant-appellee.
 Appeal from the United States District Court for the District of Oregon.
 Before: WALLACE, Chief Judge, GOODWIN, Circuit Judge, and CROCKER*, District Judge.
 GOODWIN, Circuit Judge:
 
 
 1
 Inlandboatmen's Union of Pacific National Health Benefit Trust and its trustees (collectively, the "Trust") appeal the district court's denial of a tax refund. The Trust had sued the United States seeking a refund under 26 U.S.C. § 3302(b) of taxes it had paid pursuant to the Federal Unemployment Tax Act ("FUTA"). 26 U.S.C. §§ 3301 et seq. We affirm.
 
 
 2
 The Trust is a self-insured multi-employer health benefit trust. It provides health and disability benefits to members of the Inlandboatmen's Union of the Pacific, and to their families. The Union members serve as employees for 48 employers in the states of Alaska, Washington, Oregon, California, and Hawaii. These employers make contributions to the Trust for the benefit of their employees.
 
 
 3
 The disability benefits that the Trust pays out are considered taxable "wages" under FUTA. 26 U.S.C. § 3306(b)(2), (4). Moreover, under FUTA, the Trust is treated as an "employer." 26 U.S.C. § 3306(a). Instead of allocating the disability benefit payments among its contributing employers (an administratively difficult task), the Trust pays the FUTA taxes on these benefits itself.
 
 
 4
 Between 1986 and 1989, the Trust paid FUTA taxes at 0.8% of total taxable wages. Although the FUTA tax rate is normally 6.2%, the Trust paid the lower amount claiming a credit under section 3302(b). The United States subsequently determined that the Trust was not entitled to the credit. The Trust then paid the FUTA taxes it owed and filed this action for a refund in federal district court. The court rejected the Trust's claim and the Trust timely appealed.
 
 
 5
 The Trust argues that it is entitled to the section 3302(b) credit under a proper reading of that section. Moreover, the Trust argues that in denying it the section 3302(b) credit, the United States violated the Trust's constitutional rights to equal protection and due process. Neither argument is availing as the Trust misreads section 3302(b). Before addressing the Trust's arguments, however, we will first address the origins and purpose of FUTA generally, and of section 3302(b) in particular.
 
 I. The FUTA Scheme
 
 6
 FUTA is part of a joint federal-state unemployment insurance program. The program began, in 1935, with the enactment of the Social Security Act. Pub.L. No. 271, 49 Stat. 620 (1935). Prior to 1935, very few states had enacted unemployment compensation schemes. Absent federal encouragement, states had been reluctant to impose an unemployment tax for fear of placing themselves at a competitive disadvantage with respect to business interests. Steward Machine Co. v. Davis, 301 U.S. 548, 588, 57 S.Ct. 883, 891, 81 L.Ed. 1279 (1936).
 
 
 7
 The 1935 Act dispelled this fear by imposing a uniform federal tax on all employers, offset by a credit for unemployment tax paid pursuant to state unemployment compensation schemes. The federal tax ensured that employers would pay tax to someone; the credit encouraged states to set up their own plans so that employers would pay the tax to them, rather than to the federal government. H.R. 7260, 74th Cong., 1st Sess., Sec. 902 (1935).
 
 
 8
 While the offset credit encouraged states to set up their own unemployment compensation plans, the credit did nothing to encourage employers to stabilize their employment. For example, states might decide to charge a lower unemployment tax rate to those employers with a stable employment record. If only the offset credit were allowed under the federal scheme, "good" employers who merited a lower state tax rate would end up paying the same combined federal and state unemployment tax total as "bad" employers. Put another way, although good employers would pay less to the state, they would pay more to the federal government because their federal offset would be lower. To address this problem, Congress enacted an "additional" credit. See S.Rep. No. 628, 74th Cong., 1st Sess. 14 (1935).
 
 
 9
 The additional credit was set at the amount of state unemployment tax which the employer had saved as a result of its favorable employment experience. Under this credit, the state unemployment tax savings enjoyed by good employers would be honored by the federal taxation scheme. Thus, a good employer in a state which charged a lower unemployment tax rate to employers with favorable employment experiences could offset against the uniform federal tax the amount the employer actually paid to the state, plus the amount that the employer saved in state taxes as a result of the employer's favorable employment history.
 
 
 10
 This scheme is embodied in FUTA. 26 U.S.C. §§ 3301, et seq. Section 3301 establishes a uniform federal unemployment tax rate of 6.2% for the years applicable in this case. Section 3302(a) describes the offset credit; section 3302(b) the additional credit.
 
 II. Section 3302(b)
 
 11
 The Trust pays only disability benefit payments. Although FUTA taxes these payments as "wages," the unemployment tax schemes of Alaska, Hawaii, Washington, Oregon, and California do not. Because these states do not, the Trust can never pay state unemployment tax on the payments, and thus can never be said to have saved any taxes due to a favorable employment history. Nevertheless, the Trust argues that it is entitled to section 3302(b)'s additional credit at a rate of 5.4%.
 
 
 12
 As a starting point in the analysis, consider a state which has not adopted an unemployment tax scheme. It seems clear that employers in such a state would be entitled to no credits under FUTA for wages paid in that state. After all, the credits are calculated based on state tax payments and savings. If the state has no tax scheme, there can be neither payments nor savings. This notion carries over into the situation presented by this case.
 
 
 13
 In this case, the states have adopted unemployment tax schemes, but they have not chosen to tax certain payments which are taxable under FUTA. Because of this, the states are in a position with respect to these payments analogous to that of states which have no unemployment tax scheme at all. In other words, because the western states do not tax disability benefit payments, the Trust can never pay state tax on these payments, and can never point to tax savings. Accordingly, the Trust is entitled to neither the offset credit nor the additional credit. This commonsense conclusion is supported by FUTA's language.
 
 
 14
 Section 3302(b), which describes the additional credit, reads in pertinent part:
 
 
 15
 Additional credit.... [A] taxpayer may credit against the tax imposed by section 3301 for any taxable year an amount, with respect to the unemployment compensation law of each State ..., equal to the amount, if any, by which the contributions required to be paid by him with respect to the taxable year were less than the contributions such taxpayer would have been required to pay if throughout the taxable year he had been subject under such State law to the highest rate applied thereunder ..., or to a rate of 5.4 percent, whichever rate is lower.
 
 
 16
 The first thing to note when reading section 3302(b) is that it makes use of two separate values, both of which are computed "with respect to the unemployment compensation law of [the] State." The first value--"the contributions required to be paid by [the taxpayer]"--refers to the actual amount of tax paid under the state's unemployment tax scheme. The second value--"the contributions such taxpayer would have been required to pay if ... he had been subject under such State law to the highest rate applied thereunder, ... or to a rate of 5.4% whichever rate is lower"--refers to a hypothetical amount of tax equal to the amount the taxpayer would have been required to pay had the taxpayer been subject to taxation under that law at the highest rate charged by that law, or at 5.4%, whichever rate is lower. Once the two amounts are computed, the additional credit is calculated by subtracting the actual amount from the hypothetical amount. See 26 C.F.R. § 31.3302(b)-1.
 
 
 17
 Because the actual amount in this case is zero dollars, the dispute is over the value of the hypothetical amount. Section 3302(b) defines the hypothetical amount in terms of a hypothetical tax "contribution." Contributions pursuant to a tax scheme are computed by multiplying the tax base (the monies subject to the scheme) by the tax rate mandated by the scheme. If the scheme does not cover the payments in question, then the tax base will always be zero. If the tax base is zero, it makes no difference what tax rate is used--the contributions under the scheme will always be zero.
 
 
 18
 In essence, section 3302(b) calculates a tax savings. There can be no savings if there can be no potential obligation to pay.[1] Accordingly, the Trust is not entitled to the additional credit under section 3302(b).
 
 III. Constitutional Challenges
 
 19
 The Trust next argues that in denying it the section 3302(b) credit, the government has violated the Trust's rights to equal protection and due process under the fifth amendment of the constitution. The root problem in this case is that FUTA taxes disability benefit payments but the unemployment tax schemes of the western states do not. The Trust has not demonstrated that FUTA's inclusion of these payments in the definition of "wages," or that FUTA's mode of operation as described above, is irrational. See Vance v. Bradley, 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979). The Trust's constitutional arguments are without merit.
 
 
 20
 AFFIRMED.
 
 
 21
 With the opinion thus amended, the panel has voted unanimously to deny the petition for rehearing. Chief Judge Wallace has voted to reject the suggestion for rehearing en banc, and Judge Goodwin so recommends.
 
 
 22
 The full court has been advised of the suggestion for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed.R.App.P. 35.
 
 
 23
 The petition for rehearing is DENIED and the suggestion for rehearing en banc is REJECTED.
 
 
 
 *
 Honorable M.D. Crocker, United States District Judge for the Eastern District of California, sitting by designation
 
 
 [1]
 That the Trust insists that it is being singled out among employers in the western states reveals its inability to comprehend FUTA. Every employer in these states will end up paying the full 6.2% FUTA tax on any disability benefit payments it makes, regardless whether the employer also pays out "normal" wages covered under both FUTA and the state tax scheme
 For example, say that Company A pays out $1000 in normal wages, and $100 in disability benefit payments. Assume also that the state's highest unemployment tax rate for normal wages is 5%, that it taxes Company A's normal wages at 2% because of the company's favorable employment history, and that the state does not tax disability benefit payments. Under these assumptions, Company A will pay $20 [$1000 X 2%] in state unemployment taxes.
 Under section 3301 of FUTA, Company A will be initially assessed a federal tax of $68.20 [$1100 X 6.2%]. Company A's offset credit is $20; its additional credit is $30 [ ($1000 X 5%) - $20]. (Note that had the company been subject to the highest tax rate, its contribution would have been $1000 X 5%, and not $1100 X 5%. The $100 disability benefit payment is not subject to the tax no matter what the rate.)
 Company A's federal tax is therefore $18.20 [$68.20-$20-$30]. This amount is equal to the sum of $12 and $6.20. Twelve dollars represents the FUTA contribution attributable to the normal wages [ ($1000 X 6.2%) - $20 - $30]; $6.20 represents the FUTA contribution attributable to the disability benefit payments [$100 X 6.2%]. Accordingly, Company A effectively pays the full FUTA rate on the disability benefit payments because the state does not tax the payments under its unemployment tax scheme.