704 A.2d 1310

JACK KOZA T/A TRIESTE, PETITIONER–APPELLANT,
v. NEW JERSEY DEPARTMENT OF LABOR,
RESPONDENT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted December 2, 1997—Decided January 12, 1998.

Before Judges DREIER, PAUL G. LEVY and WECKER.

*Edward J. Martz*, of the New York bar admitted pro hac vice, attorney for appellant (*Ronald L. Lueddeke*, local counsel; *Mr. Martz* and *Mr. Lueddeke*, on the brief).

*Peter Verniero,* Attorney General, attorney for respondent (*Joseph L. Yannotti,* Assistant Attorney General, of counsel; *John C. Turi,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

DREIER, P.J.A.D.

Petitioner, Jack Koza, appeals for a second time from a final decision of the New Jersey Department of Labor holding that petitioner was responsible for unemployment compensation payments for twenty-two of the twenty-four persons alleged by the Department to have been his employees when he was leader of a band called "Trieste" between 1985 and 1989. In the earlier appeal in this matter, reported at 282 *N.J.Super.* 560, 660 *A.*2d 1231 (App.Div.1995), we determined that petitioner had satisfied parts A and B of the "ABC test," *N.J.S.A.* 43:21–19(i)(6)(A),(B) and (C). *Id.* at 566–67, 660 *A.*2d 1231. We remanded "to afford petitioner an opportunity to satisfy part C of the test as suggested by the Supreme Court in *Carpet Remnant Warehouse* [*v. Department of Labor,* 125 *N.J.* 567, 593 *A.*2d 1177 (1991).]" *Id.* at 569, 660 *A.*2d 1231.

As we noted in our earlier opinion, the ALJ had failed to appreciate that the band to a large extent had been a cooperative enterprise. Although petitioner obtained most of the bookings, and saw to it that the proper sound equipment was available, he gathered an amorphous group of musician friends, different numbers of whom would play at particular times. As explained later, two musicians contended that they were paid a fixed amount per performance, and thus might satisfy the ABC test. However, most of the testimony established that when the group was paid, petitioner would deduct the group's expenses that he had advanced and then divide the money equally among all of the musicians. We described this in detail in our earlier opinion, *see* 282 *N.J.Super.* at 565–66, 660 *A.*2d 1231. We noted specifically:

In reality, this is a group of independent contractors and not an employer with employees. We question whether the ABC test is properly applied to every group

effort where the members of the group share the compensation received. For example, if three bricklayers approach a builder and offer their collective services to build a wall, does the one who receives the total payment become the employer of the other two?

[*Id.* at 566, 660 A.2d 1231].

It appears that, on remand, our view of the arrangement as gleaned from the testimony at the first hearing was largely disregarded by the agency. The ALJ noted in his opinion that we had "remanded for a narrow purpose—to give petitioner a second chance to supply the details apropos to his part C burden." While it is true that we directed that the *Carpet Remnant Warehouse* standards be applied, we did so within the context of the resolution we had made in the first appeal. The working relationship was found to be a group effort or joint venture where petitioner merely was the conduit for the payment of the group's earnings, net of expenses, to be shared by all.

Unfortunately, the hearing fell into the usual but inapplicable analysis of whether the other members of the group had independent stationery, business cards, business phones or the like. The ALJ mentioned but quickly passed over the testimony "that people in this business become known by word of mouth and do not generally have need of business cards, business phones, offices and the like." The ALJ stated: "This may be true to an extent, but the Court in *CRW* [*Carpet Remnant Warehouse* ] also instructed us to follow the money, a criteri[on] that probably cuts across all enterprise. Individuals who received substantially all of their music income from petitioner are not likely to have been independently established in the music business." This is a nonsequitur. An established musician may choose for a time to play or sing with a particular band full-time or part-time, and then move on. The relationship has no bearing upon whether the individual is established in the music business or not. If Paul Simon decides to go on a tour with Art Garfunkle under an arrangement where they share the proceeds, does either become an employee of the other? We think not, even if one acts as the business manager and collects the proceeds.

What was overlooked is that some of the musicians performed with petitioner as an avocation, others on a full-time basis, and some were freelance musicians or vocalists who had other jobs inside or outside the music industry. One person was a model, another a hair stylist, a third a real estate salesman. Petitioner provided the State with the backgrounds of all twenty-four musicians who had worked with him. With the exception of the two who claimed to the investigators that they did not share in the proceeds, but rather were paid a fixed remuneration from petitioner, the musicians who were asked about the arrangement stated that they did not work *for* petitioner, they worked *with* him. We remanded this matter after the initial appeal so that the *Carpet Remnant Warehouse* standards could be applied to any musicians or other employees who worked for petitioner. We had already made the determination that if the other musicians were participants in bookings secured by petitioner or others that were essentially a succession of joint ventures, there was to be no liability for unemployment compensation contributions. Given the disposition of the matter before the ALJ and the Commissioner, we were obviously misunderstood.

We approach our review of this record with the usual understanding that our review of an agency decision is limited, and that an administrative determination will only be overturned if "arbitrary, capricious or unreasonable or [if] it is not supported by substantial credible evidence in the record as a whole." *Henry v. Rahway State Prison*, 81 *N.J.* 571, 579–80, 410 *A.*2d 686 (1980). *See also Clowes v. Terminix Int'l, Inc.*, 109 *N.J.* 575, 588, 538 *A.*2d 794 (1988) (appellate judgment will be substituted for that of an agency if the agency's judgment is " 'so plainly unwarranted that the interests of justice demand intervention and correction' ") (quoting *State v. Johnson*, 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964)).

On this appeal we have had an opportunity again to reflect on the joint venture analysis we directed and the Department's continued focus on the ABC test. We conclude that the ABC test is inapplicable here. The preface to subsections (A), (B) and (C)

requires that the "employee" provides services "for remuneration." The implication of this section is that the remuneration flow from the putative employer to the alleged employee. In the case of a group of musicians who are sharing the money paid by a club owner for a night's work, the person who receives the money and divides it among the various band members is not paying them "remuneration." He is merely acting as a conduit in distributing the "remuneration" paid to the group by the club owner. The fact that the group has authorized him to pay their expenses off the top and share only the net amount with them does not change the recipient from a conduit to an employer. If, as the ALJ suggested, the key to the ABC test is "to follow the money," this trail should start when the group is paid by the club owner. That is where there was "remuneration." The sharing that followed is not subject to the ABC test.

This analysis should be evident. The indicia of independent contract status has little if any meaning in a setting such as the one before us. If we take the simplest situation where two musicians, such as in the Simon and Garfunkle example noted earlier, agree to play or sing as a duet and are so hired by a succession of clubs, it makes no difference whether they individually possess business cards, offices or business telephones. If an unknown duet is paid $500 per performance, or if the famous duet is paid $5,000,000, it should make no difference whether the club owner hands each of the musicians his share or pays one of them the whole and he divides the proceeds with the other. It further makes no difference if one is the "front person" who has selected the music and the other has rented the sound equipment. If only one has developed a "name," and brings in different performers to share equally in the pay for the performance, it is still no less a joint venture.

What we see before us, as compared with other arrangements, yields a resultant joint venture rather than "employment," even under the term's extended meaning under the Unemployment Compensation Law. There are two New Jersey entertainment

cases which reflect a usual employment relationship. Examples of performers receiving pay and being considered employees of the theater or amusement companies can be found in *Empire Theatre v. Unemployment Compensation Comm'n,* 136 *N.J.L.* 254, 55 *A.*2d 238 (1947), *aff'd,* 137 *N.J.L.* 301, 59 *A.*2d 623 (E. & A.1948) (specialty act performers engaged by a burlesque theater were employees of the theater), and *Steel Pier Amusement Co. v. Unemployment Compensation Comm'n,* 127 *N.J.L.* 154, 21 *A.*2d 767 (1941) (members of an orchestra were considered employees of the amusement company, not the orchestra director). We note that in the latter case, the orchestra members were not found to have satisfied part C of the test, but that the resultant employment was considered to have been by the entity hiring the orchestra, not the orchestra leader.

There are also out-of-state cases describing orchestras or bands that operate differently from the one before us, and that were sufficiently institutionalized that they had regular employees with specific salary arrangements, even if the negotiated fees were dependent upon pay from the contractual sums remitted by the band's client. *See Cutler v. United States,* 148 *Ct.Cl.* 537, 180 *F.Supp.* 360 (1960) (federal unemployment taxes were due from bandleader who paid the musicians working for him based on the union minimum rates and who negotiated the contracts that contained a profit for himself after expenses); *Barge v. Indus. Claim Appeals Office of Colorado,* 905 *P.*2d 25 (Colo.Ct.App.1995) (plaintiff was the acknowledged leader of the band with a memorandum of understanding signed by each musician requiring the musician to conform to the leader's sound and style standards, and the musicians were paid according to a schedule); *In re Sybco Int'l, Inc.,* —— *A.D.*2d ——, 663 *N.Y.S.*2d 932 (1997) (company "in the business of providing musical entertainment for catered functions" found to be an employer, based on the extent of the company's control and the methods of remuneration); *In re Philip R. Sims,* 196 *A.D.*2d 912, 602 *N.Y.S.*2d 225, 226 (1993); (payments to the musicians were based upon hours worked and the local union's scale and included mileage); *In re Captain Kishka, Inc.,*

158 *A.D.*2d 814, 551 *N.Y.S.*2d 631 (1990) (same). *See also In re S. DiCarlo, Inc.*, 234 *A.D.*2d 802, 651 *N.Y.S.*2d 248 (1996) (where a bar owner was found not to be the employer of the musicians in a band he had hired where the bandleader had agreed by contract that he would retain control over the band personnel and manner of performance and be responsible for the payment of all taxes and charges under federal and local law). In none of these cases was there a band operating on a cooperative basis without an oral or written contract placing responsibility on a bandleader.

What is unfair is that after our initial decision, and when the Agency had been presented with the facts and had found only occasional and slight possible departures from the joint venture arrangement (for which unemployment deductions might have been taken), it has still insisted on total payment, placed a lien on the alleged "employer's" real estate, and has refused every offer of compromise, asserting as its reason that the State has been put to great expense to collect the amount it alleges is due. Nowhere is there a recognition of the fact that petitioner also has been put to tremendous expense and inconvenience, even after the earlier decision, in which we laid down guidelines that should have established that all but a minor amount claimed is, in fact, not owing by petitioner.[1]

This matter must finally be concluded. To that end we will review the testimony concerning each of petitioner's former col-

---

[1] Petitioner's appendix contains an exchange of correspondence in which petitioner explained that he wished to sell his home and his newly widowed mother's home so that he could purchase a home where they could live together, and requested that the State relinquish the lien to permit the sale. He offered to consent to the judgment remaining against him personally. A later letter noted his willingness to pay the full principal amount due if the State would waive penalties and interest. It was to this letter that the State responded by listing its "enormous litigation costs over the past four years" and that it was "not economically feasible at this point for the State to waive the penalties and interest which have accrued" and that petitioner could "satisfy the State's lien against his house from part of the proceeds from its sale." These letters were written nearly a year and a half after we had indicated in our earlier opinion that we questioned the basis for the State's claim.

leagues to determine the question that should have been decided by the Department, namely, was this band a joint venture when it played in each club? If so, a subsidiary issue is whether there was proof of any variance from this practice so that petitioner's general proof of liability might falter as to a particular musician. In the phraseology of the statute, we will determine which if any of the musicians could properly have been said to have performed "for remuneration" (from petitioner), and thus under *N.J.S.A.* 43:21–19(i)(6) would then have been subject to the ABC test. We note that although petitioner had the burden of proof that the ABC test was satisfied as to each individual to whom such alleged "remuneration" was paid, he need not prove this on a person by person basis. There is no reason why he cannot by his testimony and that of others show the band's general practice.

Although *Carpet Remnant Warehouse* clearly places the burden of proof upon the challenger to the Department's classification concerning the criteria of the ABC test, 125 *N.J.* at 581, 593 *A.*2d 1177, this appears to be the first case since *Steel Pier* that focuses upon whether the putative employer was actually a co-worker in a joint venture, a different arrangement than that in the other cited musician cases. We have therefore focused upon whether petitioner provided "remuneration" to the other musicians rather than his being merely a co-recipient of remuneration from the club owners.

Petitioner offered his testimony and that of four former band members. They testified not only of their own participation, but that of others in the band. Petitioner's testimony was unimpeached that he had unrelated employment as a sound engineer and that he also played in a band he called Trieste, did recording, arranged music and taught guitar. At times he would play alone under the name Trieste, and sometimes Trieste would consist of three, five, eight or eleven members, and not always the same members. Also, the band at times played as Trieste without petitioner, and petitioner played in bands other than Trieste.

He obtained bookings through music agencies and word-of-mouth and would receive offers of employment by clubs where he would require additional musicians. As we noted in our earlier opinion, the band had no leader, although songs or instrumental solos might make one individual or another the leader of the particular number. The band members would know how to start or stop a song from practice sessions where everybody would make suggestions. The band had a business checking account, business cards and an information "hot line" concerning the band's appearances. Petitioner filed federal Schedule C's for the audit period, listing the deductions he had made from the gross intake for group expenses and further reflecting the division of the net proceeds among all of the musicians. No invoices were given to the night clubs because the band was paid when the commitment was satisfied. Generally payments were made in cash which was divided, but if the payment was made by check to Trieste, petitioner either would endorse the check back to the night club who would divide the proceeds or would deposit the check in the band's checking account and then split the proceeds with the other members.

Steven Jankowski, a trumpet player, testified that he has worked as a self-employed musician since he was eighteen years old. During the time he worked with petitioner he also worked with other bands and has continued to do so since he stopped working with petitioner. During the audit period, he maintained his own business and also hired subcontracting musicians when he overbooked himself and could not honor his scheduled commitments. He advertised in a music magazine, dispensed business cards and other promotional materials. He earned only ten percent of his total income during the audit period working with petitioner and typically was paid in cash when the proceeds were divided at the end of the night. He filed his own Schedule C's with his federal tax returns. The ALJ found that Jankowski was truly an independent contractor and satisfied part C of the test.

Similarly, Thomas Timko, a freelance saxophone player, testified that he did not consider petitioner to be his boss, but rather worked with him on a freelance basis. Although petitioner often would decide which songs to play, the only person who could tell him how to play was whoever paid him at the end of the night. He did not invoice petitioner or other bands he played with, but the owner of the club where they played would give the players cash at the end of the night. He would call petitioner as well as other bands with whom he worked and ask if there was work available, and work with petitioner constituted between thirty-five and forty percent of his 1989 income. In that year he made $6745 working with petitioner, but during the same year he worked three months with Andrew Dice Clay and earned $6000. He had no employees of his own, no business bank account and used his home phone for business, but he has advertised through business cards and at trade shows. The ALJ also found that Timko was not employed by petitioner, but rather was an independent contractor.[2]

Another musician, Barry Jones, testified that he worked with petitioner briefly for a year or so, apparently during the audit period as claimed by the Department. He worked with petitioner for a year practically full-time before deciding that he was not going to be a full-time musician. He testified clearly that when the band was paid they shared expenses by paying the light and sound people off the top, but all that petitioner did was count the cash they received and always split it evenly among the musicians.

Dennis Nanton, a keyboard player, worked with petitioner in 1989 and part of 1988 and during that time also played by himself in lounges. He testified, as did others, that anytime someone came to him with a higher paying offer he was free to take it. He

---

[2] We note, however, that the Department of Labor had contended to the contrary with respect to both Jankowski and Timko, claiming that they were petitioner's employees. The auditors still insisted that these musicians had no established businesses. This was so even after Timko sent the investigator a copy of the 1099 form petitioner had sent to him, copies of his business cards and newspaper clippings to prove that he was a freelance musician.

made more than half his income from working with (not for) petitioner. He further testified there was no clear leader to the band, everybody selected songs, often depending upon what the singer could sing.

When petitioner testified, he was asked to describe the other members of his band during this period to demonstrate that they were practicing musicians who had gone on and played with other groups. In doing this he noted that some had worked with him for as little as a week or two or played on only a few occasions because they were busy with other bands.

The State auditors testified that they had interviewed many former band members, but their questioning related to the percentage of the time during the year that they may have worked for petitioner, whether they filed separate Schedule C's, had business cards, advertised or the like. With the exception of two of these band members, none took issue with petitioner's and the other testifying band members' statements that when the band played it was as a joint venture.

One band member, Noelle Gualbello, a freelance vocalist, contended that she was paid a set rate, $50 per night, and was usually paid at the end of the week. Petitioner testified that since she stopped performing with Trieste, he had seen her perform with four different groups in New York City. The auditor's testimony on this subject is a single short paragraph, a hearsay rendition (admissible in an administrative proceeding) by the investigator of what the singer told her. This might be the basis to assess a small amount of unemployment contribution deficiency, but it would be an unreasonable basis to determine that the petitioner's and the other band members' testimony was untrue concerning the way petitioner generally operated.

One other band member, John D'Amato, a drummer, told another investigator that he remembered, years after the event, that petitioner owned everything (as opposed to considerable testimony from others that most sound and lighting equipment had been rented), and members were paid a prearranged salary.

As far as D'Amato knew he was a side man in the band, and in the industry side men are considered employees. Petitioner remembered D'Amato as a drummer who he stopped using and who was now working in a duo with his wife on the band circuit in New Jersey. This is the second and only other indication that some band members may have been paid a set amount. There thus was a basis in this record to assess unemployment deductions for D'Amato.

Many band members were not contacted. Any member who could not be located was assumed by the investigators to be an employee. Such assumptions overlooked the threshold question that had to be reached by the ALJ and Commissioner: Did petitioner and the other band members operate as a joint venture (in which case there was no "remuneration" paid by petitioner to the members of the band), or, conversely, did petitioner employ the other band members? On one side we see the testimony of petitioner and the other band members that bespeak a cooperative effort. On the other side we see two hearsay statements of band members through investigators who testified that the members said they were paid set amounts and considered themselves employees. The latter statements and others in the investigator's reports were made as part of an investigation concerning whether the individual band members ran independent businesses at that time. They had not focused on the shared enterprise nature of the band. The declarants were not subject to cross-examination or even a probing as to what they had meant by their statements. The live witnesses had been subject to extensive direct and cross-examination. On these facts, it would be patently unreasonable to determine this threshold issue against petitioner.

To bring an end to this case, we exercise our factfinding jurisdiction, *R.* 2:10–5, and find that petitioner's practice was to divide the net proceeds with the band members. The most that can be said for the Department's case is that there may have been two instances where musicians were hired for a set fee.[3] Neither

---

[3] It also might be said that the $50 one singer was paid happened to be the pro rata share for that evening's work and that the "salary" was again nothing more

of the two isolated instances constitutes a sufficient basis to assume that the other musicians who were contacted and were not asked questions concerning the payment process, or those musicians who were never contacted, would have supported the Department's thesis that petitioner's position as the one who generally obtained the bookings also made him the other musicians' employer. Petitioner's burden of proof has been satisfied with respect to the band's payment practices. His obligation would only have been to establish this practice, not to bring in each of the twenty-four former members of the band.

We therefore reverse the determination that petitioner is responsible for unemployment deductions, penalties and interest concerning all but those related to Noelle Gualbello and John D'Amato. We leave to the Department on remand the decision whether these assessments should be waived as *de minimis* at this point. Perhaps the State will apply the logic of its December 11, 1996 letter to petitioner's counsel, but note in this instance that petitioner has "incurred enormous litigation costs over the past four years" requiring "two plenary hearings before the Office of Administrative Law and two appeals to the Superior Court of New Jersey, Appellate Division." Possibly the State might acknowledge that the derangement in petitioner's life and his inability to sell his house over the past years might be offset against the small amount that might now be subject to assessment. We, of course, cannot order such relief, but merely make this as a suggestion.

The final determination of the New Jersey Department of Labor is reversed and the matter is remanded for the conclusion of these proceedings.

---

than the even division of the proceeds to be obtained from the club owner. Without cross-examination we do not know how much of the recollection of these former colleagues might have been stirred by further questioning.