742 A.2d 1023 (2000)
327 N.J. Super. 197
SPECIAL CARE OF NEW JERSEY, INC., Petitioner-Appellant,
v.
BOARD OF REVIEW and Christine Reistle, Respondents-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted November 15, 1999.
Decided January 10, 2000.
*1025 Heimbach, Spitko & Heckman, Allentown, PA, for petitioner-appellant (Nancy Conrad, Patricia O'Malley, General Counsel, and Scott C. Heckman, on the brief).
John J. Farmer, Jr., Attorney General of New Jersey, for respondent (Joseph L. Yannotti, Assistant Attorney General, of counsel; Ellen A. Reichart, Deputy Attorney General, on the brief).
Respondent Christine Reistle did not file a brief.
Before Judges HAVEY, KEEFE and LINTNER.
*1024 The opinion of the court was delivered by HAVEY, P.J.A.D.
Special Care is a companion sitting placement agency, which refers caregivers to elderly and disabled persons in need of nonmedical services. The central issue raised by this appeal is whether a provision of the Federal Unemployment Tax Act (FUTA), 26 U.S.C.A. §§ 3301 to 3311, which exempts such agencies from payment of federal employer taxes, preempts New Jersey's Temporary Disability Benefits Law (TDBL), N.J.S.A. 43:21-25 to -66, which does not afford such an exemption. We agree with the Board of Review that FUTA does not preempt the State's TDBL, and accordingly affirm.
Special Care recruits caregivers through newspaper advertisements. A potential caregiver completes an application, provides references, and is interviewed by Special Care representatives. Upon finding the applicant to be qualified, the parties enter into a "Caregiver's Agreement," under which Special Care assigns clients in need of services to the caregiver. The caregiver is required to report his or her performed hours each week. Special Care fixes the fees to be charged by the caregivers, "commits to nothing and remains free to change wages and other working conditions without having to consult anyone...." The agreement further provides that Special Care "continues to have the absolute power to fire anyone with or without good cause."
Caregivers file their hours with Financial Health Services, Inc. (FHS), a billing service retained by Special Care. FHS processes the invoices completed by the caregivers and submits them to, and receives payments from, third-party payors. It then pays the caregivers and forwards a fee to Special Care.
Claimant, Christine Reistle, worked as a caregiver for Special Care from April 22, 1994 until November 12, 1994, when she filed a claim for temporary disability benefits pursuant to the TDBL. Immediately *1026 prior to becoming disabled, Ms. Reistle provided services to an elderly client. The Gloucester County Office on Aging paid a total of $3,176.10 for these services and the client paid a portion of the expenses herself.
The Deputy Director found that Ms. Reistle was eligible for temporary disability benefits without disqualification and that Special Care was the chargeable employer. The Appeal Tribunal affirmed the Deputy's determination. Special Care appealed to the Board of Review, which remanded the matter to the Appeal Tribunal for a rehearing and a new decision, apparently because portions of the testimony from the Appeal Tribunal hearings were lost or not recorded. Following a rehearing, the Appeal Tribunal reaffirmed its determination that Ms. Reistle was entitled to benefits, finding that she was "considered to be an employee and not an independent contractor," as Special Care had argued.
Special Care filed a second appeal with the Board, arguing that its employer status must be determined in accordance with § 3506(a) of FUTA. Special Care reasoned that since it was not considered an "employer" under this provision of the federal Act, it could not be considered an "employer" under the TDBL. Alternatively, it argued that Ms. Reistle was not an "employee" because she had not been employed by a "covered employer," as defined under the TDBL.
The Board affirmed as modified the Appeal Tribunal's determination, finding that Ms. Reistle was an "employee" under the ABC test, N.J.S.A. 43:21-19(i)(6)(A)(B)(C). However, the Board did not specifically address whether Special Care was a "covered employer," as defined by N.J.S.A.43:21-27(a)(1). Accordingly, in May 1996, Special Care appealed to us from the Board's determination. Pursuant to the Board's motion for a final remand in order to consider whether Special Care was a "covered employer," we dismissed Special Care's appeal and entered an order dated May 28, 1997, directing that "[t]he Board shall reconsider the matter and make its determination after remand within forty five days."
On June 16, 1998, the Board affirmed the Appeal Tribunal's determination that Ms. Reistle was entitled to benefits, concluding that Special Care was a "covered employer" under the TDBL and that FUTA did not preempt state law.
I
Special Care first argues that the Board lacked jurisdiction when it issued its final determination more than eleven months after the forty-five day deadline mandated by our order of remand. Special Care maintains that the Board's failure to adhere to our order rendered its decision a "nullity" requiring reversal as a matter of law. We disagree.
The Board does not account for its extra ordinary delay in rendering its decision. Clearly, it lacked authority to delay its disposition eleven months, when we specifically ordered it to "make its determination after remand within forty-five days." An inferior tribunal is "under a peremptory duty to obey in the particular case the mandate of the appellate court precisely as it is written." Flanigan v. McFeely, 20 N.J. 414, 420, 120 A.2d 102 (1956) (citing In re Plainfield-Union Water Co., 14 N.J. 296, 303, 102 A.2d 1 (1954)). See also Jersey City Redev. Agency v. Mack Properties Co. # 3, 280 N.J.Super. 553, 562, 656 A.2d 35 (App.Div. 1995).
However, the remedy Special Care seeks is not justified by the Board's delay, particularly where the record reveals no effort by Special Care to compel the Board to act. See Loigman v. Township Comm. of Middletown, 297 N.J.Super. 287, 299, 687 A.2d 1091 (App.Div.1997) (holding that mandamus is a proper remedy to compel governmental action). Moreover, delay in an administrative disposition "will not generally *1027 affect the validity of [a decision], particularly where no prejudice is shown." In re Garber, 141 N.J.Super. 87, 91, 357 A.2d 297 (App.Div.), certif. denied, 71 N.J. 494, 366 A.2d 650 (1976). Special Care does not claim prejudice. Nor do the facts suggest there was substantial injustice amounting to deprivation of due process. In re Kallen, 92 N.J. 14, 26, 455 A.2d 460 (1983); Kramer v. Board of Adjustment, Sea Girt, 45 N.J. 268, 285, 212 A.2d 153 (1965) ("Since there is no indication that plaintiffs did not receive substantial justice, this court will not set aside the Board's decision for alleged errors in the manner that the proceedings were conducted."); see also J. Abbott & Son, Inc. v. Holderman, 46 N.J.Super. 46, 56-57, 133 A.2d 705 (App.Div.1957) (refusing to nullify agency action that failed to comply with statute governing administrative procedure, particularly where a fundamental policy needing vindication was not involved). Although we do not condone the Board's delay, its decision should not be nullified because of it.
II
Special Care argues that the provision in the TDBL deeming it a "covered employer" is preempted by the federal provision exempting it as an "employer." The federal exemption in question provides in pertinent part:
(a) In general.For purposes of this subtitle, a person engaged in the trade or business of putting sitters in touch with individuals who wish to employ them shall not be treated as the employer of such sitters (and such sitters shall not be treated as employees of such person) if such person does not pay or receive the salary or wages of the sitters and is compensated by the sitters or the persons who employ them on a fee basis.
(b) Definition.For purposes of this section, the term "sitters" means individuals who furnish personal attendance, companionship, or household care services to children or to individuals who are elderly or disabled.
[26 U.S.C.A. § 3506.]
Special Care reasons that § 3506(a) demonstrates that "Congress unequivocally intended to exempt companion sitting placement agencies like Special Care from the financial and administrative burden of federal and state unemployment taxes, so long as the agencies did not pay the sitters they placed with their ... clients." (Emphasis added).
Under the Supremacy Clause, U.S. Const., art. VI, cl. 2, "state laws that `interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution' are invalid." Maher v. New Jersey Transit Rail Operations, Inc., 125 N.J. 455, 464, 593 A.2d 750 (1991) (quoting Wisconsin Pub. Intervenor v. Mortier, 501 U.S. 597, 604, 111 S.Ct. 2476, 2481, 115 L.Ed.2d 532, 542 (1991) (quoting Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23, 73 (1824))). When Congress has not expressly set forth its intent to preempt state law, "congressional intent to supersede state law in a given area is implicit if the scheme of federal regulation is `so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'" Ibid. (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447, 1459 (1947)).
Even where congressional intent to occupy the field is absent, "a court must find state law to be preempted `to the extent that it actually conflicts with federal law.'" Ibid. (quoting Brown v. Hotel & Restaurant Employees & Bartenders Int'l Union Local 54, 468 U.S. 491, 501, 104 S.Ct. 3179, 3185, 82 L.Ed.2d 373, 383 (1984)). Actual conflict is found where compliance with both state and federal law is physically impossible, Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248, 257 (1963), or where state law "impedes the accomplishment of the full purposes and objectives of Congress...." *1028 Maher, supra 125 N.J. at 465, 593 A.2d 750 (citing Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258, 265 (1981)).
In any preemption analysis, the "`settled mandate' governing preemption of matters traditionally under state supervision `is not to decree such a federal displacement "unless it was the clear and manifest purpose of Congress."'" Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 85, 577 A.2d 1239 (1990) (quoting Florida Lime & Avocado Growers, Inc., supra, 373 U.S. at 146, 83 S.Ct. at 1219, 10 L.Ed.2d at 259 (quoting Rice v. Santa Fe Elevator Corp., supra, 331 U.S. at 230, 67 S.Ct. at 1152, 91 L.Ed. at 1459)). See also Gurrieri v. William Zinsser & Co., 321 N.J.Super. 229, 233, 728 A.2d 832 (App.Div.1999) ("Greater restraint applies to preemption of spheres traditionally occupied by the states."). Where "federal law is said to bar state action in fields of traditional state regulation ..., we have worked on the `assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655, 115 S.Ct. 1671, 1676, 131 L.Ed.2d 695, 704-05 (1995) (quoting Rice v. Santa Fe Elevator Corp., supra, 331 U.S. at 230, 67 S.Ct. at 1152, 91 L.Ed. at 1459).
FUTA, enacted originally as Title IX of the Social Security Act of 1935, "envisions a cooperative federal-state program of benefits to unemployed workers." Wimberly v. Labor & Indus. Relations Comm'n, 479 U.S. 511, 514, 107 S.Ct. 821, 823-23, 93 L.Ed.2d 909, 913 (1987). Congress' purpose was to encourage states to enact uniform unemployment insurance statutes, so that the unemployed would no longer suffer because states, in order to protect their respective economic positions, avoided imposing unemployment taxes on employers operating within their borders.
See Inlandboatmen's Union of the Pac. Nat'l Health Benefit Trust v. United States, 972 F.2d 258, 259 (9th Cir.1992) (citing Charles C. Steward Mach. Co. v. Davis, 301 U.S. 548, 588, 57 S.Ct. 883, 891, 81 L.Ed. 1279, 1291 (1937)).
By enacting FUTA, Congress "did not undertake to create a nationally administered employment compensation system." Salem College & Academy, Inc. v. Employment Div., 298 Or. 471, 695 P.2d 25, 29 (1985). Rather, Congress encouraged the states to set up their own unemployment compensation systems by granting employers in states complying with the requirements of 26 U.S.C.A. § 3304 a ninety-percent credit against their federal unemployment taxes for taxes paid to state unemployment plans. 26 U.S.C.A. § 3302. However, FUTA "does not call for a surrender by the states of powers essential to their quasi-sovereign existence." Charles C. Steward Mach. Co., supra, 301 U.S. at 593, 57 S.Ct. at 893, 81 L.Ed. at 1294. The obvious purpose of § 3304 in demanding adherence to these minimum standards is to establish uniformity, which protects the unemployed in a consistent and predictable manner. McKay v. Horn, 529 F.Supp. 847, 850-51 (D.N.J.1981). Once they comply with these mandatory standards, "states [have] great latitude regarding the parameters of their unemployment-compensation laws." Carpet Remnant Warehouse, Inc. v. New Jersey Dep't of Labor, 125 N.J. 567, 578-79, 593 A.2d 1177 (1991).
Although they are complementary, FUTA and New Jersey's unemployment tax law are distinct and separate, representing "independent acts of two distinct legislative bodies." Quality Coal Co. v. United States, 66 F.Supp. 105, 107 (W.D.Ark.1946). They, of course, may coexist, but each can exist without the other. Ibid. State programs need not mirror the provisions under FUTA in all respects; they are empowered to vary their programs so long as they meet the requirements for certification under § 3304. Macias *1029 v. New Mexico Dep't of Labor, 21 F.3d 366, 368 (10th Cir.1994). Therefore, the fact that FUTA excludes certain persons or entities from its payroll tax "does not preclude a state from including those [persons or entities] in its definition." In re Forrence Orchards, Inc., 85 A.D.2d 44, 448 N.Y.S.2d 803, 804 (App.Div.1982). A state legislature is thus empowered to determine what is exempt "without regard to existing definitions, and is not required to conform in every respect to the federal scheme." Ibid. See also Equitable Life Ins. Co. v. Iowa Employment Sec. Comm'n, 231 Iowa 889, 2 N.W.2d 262, 265 (1942) ("That the [state] legislature may determine what shall constitute employment subject to taxation without regard to existing definitions or categories and that it is not required to conform in every respect to the national ideology upon the subject as expressed in the Acts of Congress, is well settled.").
Indeed, the United States Supreme Court has expressly held that the existence of an exemption under FUTA does not mandate the same exemption under state law. Standard Dredging Corp. v. Murphy, 319 U.S. 306, 310, 63 S.Ct. 1067, 1069, 87 L.Ed. 1416, 1420 (1943). In Standard Dredging Corp., New York collected unemployment insurance taxes from employers of maritime workers. The employers challenged the tax, arguing that since FUTA exempted employers of maritime workers from federal unemployment taxes, Congress had declared expressly or by implication that no such tax should be imposed by the state. Id. at 307, 63 S.Ct. at 1068, 87 L.Ed. at 1418-19. The Supreme Court rejected the employers' preemption claim, reasoning that the federal exemption had been created because of certain administrative difficulties regarding coverage. The Court found no evidence that Congress intended to prevent states from tackling those difficulties, if they so chose. The Court stated:
The federal Act, from the nature of its ninety per cent credit device, is obviously an invitation to the states to enter the field of unemployment insurance ... but the absence of an invitation as to employers of maritime workers is not to be construed as a barrier to state action.
[Id. at 310, 63 S.Ct. at 1069, 87 L.Ed. at 1420 (citation omitted).]
The Court added:
The legislative history of other exemptions may indicate that they were intended to oust the states of jurisdiction...; but current administrative practice under the Act indicates that there is nothing in the mere existence of a federal exemption which necessarily required that states not undertake to expand the social security program in this field.
[Id. at 311, 63 S.Ct. at 1069, 87 L.Ed. at 1421.]
New Jersey's unemployment compensation laws represent an exercise of police power that "provide[s] a cushion for the workers of New Jersey `against the shocks and rigors of unemployment.'" Carpet Remnant Warehouse, Inc., supra, 125 N.J. at 581, 593 A.2d 1177 (quoting Provident Inst. for Sav. in Jersey City v. Division of Employment Sec., 32 N.J. 585, 590, 161 A.2d 497 (1960)). The TDBL was specifically intended to fill the gap left by New Jersey's Unemployment Compensation Law, N.J.S.A. 43:21-1 to -19, and the Workers' Compensation Act, N.J.S.A. 34:15-1 to -142, by providing benefits for earning losses due to nonoccupational sickness and accident. N.J.S.A. 43:21-26; see also Potts v. Barrett Div., Allied Chem. & Dye Corp., 48 N.J.Super. 554, 559-60, 138 A.2d 574 (App.Div.1958). Nothing in the plain language of FUTA suggests that Congress intended to supersede our own state's exercise of its police power in achieving these goals, provided that it comply with the requirements set out in 26 U.S.C.A. § 3304. New Jersey's choice not to exclude companion sitting placement agencies from its definition of "covered employer" is a proper exercise of its taxing power. Compliance with both the TDBL and FUTA is clearly not physically *1030 impossible, Florida Lime & Avocado Growers, Inc., supra, 373 U.S. at 142-43, 83 S.Ct. at 1217, 10 L.Ed.2d at 257, and enforcement of the TDBL in no way impedes Congress' objectives under FUTA. Maher, supra, 125 N.J. at 465, 593 A.2d 750.
In arguing that the "clear and virtually sole intent" of Congress in enacting § 3506 was to protect agencies such as Special Care from the financial burdens of both federal and state unemployment taxes, Special Care points to a statement by a sponsor of the bill ultimately enacted as § 3506, that the imposition of federal employment taxes had the practical effect of "driv[ing] companion sitter agencies out of business or [bringing] them to the brink of bankruptcy." 123 Cong. Rec. 933, 947 (Oct. 17, 1977) (Statement of Sen. Allen).
Of course, the legislative history and policy surrounding a statute may be considered in determining the scope of preemption. Medtronic, Inc. v. Lohr, 518 U.S. 470, 486, 116 S.Ct. 2240, 2250-51, 135 L.Ed.2d 700, 715 (1996). Section 3506 was enacted in response to the Internal Revenue Service's vigorous effort under Revenue Ruling 74-414 to collect FICA and FUTA taxes from companion sitting placement agencies. The sponsor's concern that federal taxes were placing such businesses "on the brink of bankruptcy" was predicated on the substantial 6.2 percent federal tax imposed on employers. 26 U.S.C.A. § 3301; 123 Cong. Rec., supra, at 947. The sponsor made no reference to the potential impact of state unemployment taxes on such businesses. Moreover, with its preamble, "[f]or the purposes of this subtitle," § 3506(a) by its plain language limits its applicability to federal law. (Emphasis added). Nothing in the legislative history suggests that Congress intended to extend the statute's applicability to state law. We are therefore not persuaded that the legislative history of § 3506(a) demonstrates Congress' intent to preempt.
III
Special Care alternatively argues that the Board erred in determining that it is a "covered employer," which is defined under the TDBL as "any individual or type of organization ... who is an employer subject to ... [New Jersey's] Unemployment Compensation Law...." N.J.S.A. 43:21-27(a)(1). The Unemployment Compensation Law defines "employer" as "[a]ny employing unit which ... paid remuneration for employment in the amount of $1,000.00 or more," N.J.S.A. 43:21-19(h)(1), and "employment" as "[a]ny service performed ... for remuneration under any contract of hire, written or oral, express or implied." N.J.S.A. 43:21-19(i)(1)(A). Special Care reasons that it is not a "covered employer" and that Ms. Reistle is therefore not an "employee" under the TDBL because Special Care does not pay its caregivers, and thus does not fall under the definition of "employer." We disagree.
Special Care conceded during the hearings before the Appeal Tribunal that Ms. Reistle was an "employee" under the "ABC test." N.J.S.A. 43:21-19(i)(6)(A)(B)(C). Counsel for Special Care stated, "I'm not disagreeing that if we use the ABC test, we would be a covered employer under your law. I'll admit to that. I'll stipulate to that," and "[w]e stipulate that [the caregivers] are employees under the ABC test...." Nevertheless, Special Care now maintains that it is not a "covered employer" because it has structured its relationship with its caregivers so that it does not pay "remuneration" to them (in adherence to § 3506). Special Care points to the fact that its billing service processes the invoices submitted by the caregivers, receives payments from the clients or third-party payors, pays the caregivers and forwards fees to Special Care.
Under N.J.S.A.43:21-19(i)(6), services performed by an individual for remuneration are deemed to be "employment" unless all the requirements of the *1031 ABC test are met. N.J.S.A. 43:21-19(i)(6)(A)(B)(C). We agree with the Board that, based on Special Care's concession that Ms. Reistle is an employee under the ABC test, it follows that remuneration was paid to her by Special Care. The Board points out that, "[i]f the billing company, the patient, or the County were not [Ms. Reistle's] employer, the only entity which would have a legal obligation to pay the wages would be Special Care." We agree. Special Care is not relieved of its obligation under the unemployment laws simply because a separate billing service collects the caregiver fees from clients or third-party payors and then remits a fee to Special Care. The Board correctly argues that such an accommodation, although sufficient to qualify for exemption under FUTA, "does not alter the essential employer/employee relationship" between Ms. Reistle and Special Care under New Jersey law.
Koza v. New Jersey Dep't of Labor, 307 N.J.Super. 439, 444, 704 A.2d 1310 (App. Div.1998), cited by Special Care, is inapposite. There, we simply held that the ABC test was inapplicable where a group of musicians shared money paid by a club owner to a person who received the money and divided it among the band members. Id. at 443-44, 704 A.2d 1310. The ABC test did not apply because the person collecting the money was not paying the band members "remuneration"; he merely acted as a conduit in distributing the "remuneration" paid to the group by the club owner. Id. at 444, 704 A.2d 1310. No such collective endeavor or joint venture is implicated here.
Affirmed.