**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3983-23

ZJN, LLC,

     Petitioner-Appellant,

v.

NEW JERSEY DEPARTMENT
OF LABOR AND WORKFORCE
DEVELOPMENT,

     Respondent-Respondent.

_____

Submitted September 16, 2025 – Decided October 3, 2025

Before Judges Rose and DeAlmeida.

On appeal from the New Jersey Department of Labor and Workforce Development, Docket No. DOL 22-022.

Calzaretto & Bernstein LLC, attorneys for appellant (John Calzaretto, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent (Sookie Bae, Assistant Attorney General, of counsel; Marc Peralta, Yael Fisher, and Eve Weissman, Deputy Attorneys General, on the brief).

PER CURIAM

ZJN, LLC, appeals from a July 12, 2024 final administration decision by the Commissioner of the Department of Labor and Workforce Development finding ZJN liable for unpaid contributions to the unemployment compensation and disability benefits fund (UCDB fund) under the Unemployment Compensation Law (UCL), N.J.S.A. 43:21-1 to -71. Because we conclude ZJN has not demonstrated the Department's decision was arbitrary, capricious, or unreasonable, we affirm.

## I.

We summarize the record before the Commissioner. ZJN is a New Jersey limited liability company, operated by its sole member, Stewart Rosenzweig, from his home office in Sewell. ZJN does business as Time Productions, providing disc jockey (DJ) services for weddings, proms and other events.

The Department audited ZJN for unpaid contributions to the UCDB fund for the period between January 1, 2015 and December 31, 2019, after a previous audit revealed ZJN was an unregistered employer. The Department's auditor, Ishan Shah, reviewed ZJN's records and sent standard form questionnaires to those individuals who worked with ZJN during the audit period. Only six workers returned the questionnaires; none of the DJs provided documents establishing they had businesses or clients independent from ZJN.

A-3983-23

Based on the information received, the Department concluded the DJs were ZJN's employees pursuant to the so-called "ABC test" for evaluating whether workers are employees or independent contractors. N.J.S.A. 43:21-19(i)(6)(A) to (C). The Department assessed ZJN $21,367.13[1] in unpaid contributions to the UCDB. See N.J.S.A. 43:21-7(c). ZJN challenged the Department's decision and the matter was transmitted to the Office of Administrative Law as a contested case.

The Administrative Law Judge (ALJ) conducted a two-day hearing during which the Department presented the testimony of Shah and moved into evidence his audit reports and related documents. On its behalf, ZJN called Rosenzweig and two DJs, Keenan Clemmons and Thomas Geist, but did not present documentary evidence.

Shah testified he performed the audit, reviewed ZJN's documents, and applied the ABC test to determine whether the workers were employees or independent contractors. Shah explained employers are required to issue Forms 1099 to workers who made more than $600 in a year.

---

[1] Consistent with the statutory interest accrual rate, the record provided on appeal indicates the amount is $45,645.29. See N.J.S.A. 43:21-7(c); N.J.S.A. 43:21-14.

Shah concluded ZJN failed to prove the DJs met the ABC test because: "the DJs and entertainers are not free from the employer's direction and control"; "[t]he services are performed at temporary work sites with [sic] belong to the employer's clients which can be considered an extension of the employer's workplace"; and the DJs "do not operate independently established businesses."

Clemmons testified he worked full-time as a pit manager at a Pennsylvania casino and operated a sole proprietorship as a DJ entertainer under the trade name "DJ Keys." He stated he maintained his entertainment business separately and booked gigs through various agencies, including ZJN. Clemmons testified he: negotiated his own rates with ZJN; was sometimes paid directly by the clients; was not paid as an employee; was free to accept or decline events from ZJN; and was not supervised by ZJN. Should ZJN cease its operations, Clemmons stated he would continue to operate as a DJ.

Geist testified he was employed as a full-time, licensed home inspector and operated a DJ company, Premiere Entertainment Group. Geist stated he knew Rosenzweig for around twenty-five years, Rosenzweig periodically offered him DJ gigs, but Geist also worked with other agencies. Geist further testified he: had his own equipment and paid for the cost of any repairs; controlled his own performances as a DJ; was not supervised or trained by ZJN;

A-3983-23

was free to accept or reject a gig from ZJN; communicated directly with the clients regarding his performances; and was not financially dependent on ZJN.

Lastly, Rosenzweig testified ZJN acted as a "booking agency" for DJ entertainers. Rosenzweig explained he negotiated the price with ZJN's clients, performed as a DJ or contacted one of ZJN's DJs, who could accept or reject the gig, received payment from the client, and transmitted payment to the DJs for their services.

Rosenzweig further testified he understood the DJs were independent contractors and "exempt from being considered employees." According to Rosenzweig, he "ha[d] nothing to do whatsoever with [the DJ's] performance on an event date"; ZJN did not provide training, supervision, instructions on how to perform, music or other equipment to the DJs; and the DJs were free to "operate independently." Accordingly, ZJN issued Forms 1099 to the DJ entertainers.

According to the documentary evidence introduced at the hearing, ZJN's website advertised its DJs, featuring their names, photos and descriptions. ZJN's business registration application and Schedule C to Form 1040 described the company as "disc jockey services."

A-3983-23

Following the hearing, the parties submitted closing briefs. In its post-hearing brief, ZJN cited our decision in Koza v. New Jersey Department of Labor, 307 N.J. Super. 439, 442 (App. Div. 1998), and argued the ABC test was inapplicable here because ZJN shared "a joint venture relationship with [the] DJ [e]ntertainers," who did not "provide[] services for remuneration." In the alternative, ZJN asserted it had established all three prongs of the ABC test and therefore its DJs should have been classified as independent contractors, not employees.

In her initial decision that followed, the ALJ did not expressly reject ZJN's joint venture argument, but applied the ABC test and concluded all ZJN's DJs, except Clemmons and Geist, were ZJN's employees. In particular, the ALJ found ZJN established prongs A and B of the ABC test for all DJs, but only established prong C for Clemmons and Geist. The ALJ therefore concluded ZJN was liable for unreported wages for all other "1099 recipients and casual laborers,"[2] except Clemmons and Geist, during the audit period.

ZJN thereafter filed exceptions to the ALJ's initial decision. ZJN argued all its DJs were similarly situated to Clemmons and Geist. ZJN therefore sought

---

[2] The ALJ explained casual laborers were "those individuals making less than $600 in a calendar year."

modification of the ALJ's decision to reflect all its DJs satisfied the ABC test. ZJN did not file an exception to the ALJ's implicit rejection of its joint venture argument or her conclusion that ZJN failed to demonstrate its casual laborers satisfied the ABC test.

On July 12, 2024, the Commissioner issued a final decision. On de novo review of the record, the Commissioner rejected the ALJ's ultimate conclusion and found ZJN failed to meet all three prongs for all DJs. See N.J.S.A. 52:14B-10(c) (requiring an agency head to review the record and "adopt, reject[,] or modify" the ALJ's initial decision). The Commissioner thus found ZJN liable for all unpaid contributions to the UCDB fund for all the DJs during the audit period. This appeal followed.

In its overlapping arguments before us, ZJN argues the Commissioner unlawfully reversed the ALJ's decision, which ZJN contends was supported by the record. ZJN maintains it had a "joint venture relationship with DJ [e]ntertainers" and, as such, the Commissioner and the ALJ erroneously applied the ABC test. ZJN also argues the ALJ's decision was arbitrary, capricious, and unreasonable because it was not extended to all "similarly situated DJ entertainers."

II.

Our scope of review is circumscribed. We review decisions "made by an administrative agency entrusted to apply and enforce a statutory scheme under an enhanced deferential standard." East Bay Drywall, LLC v. Dep't of Lab. & Workforce Dev., 251 N.J. 477, 493 (2022); see also Hargrove v. Sleepy's, LLC, 220 N.J. 289, 301-02 (2015). That enhanced deference emanates, in part, from "the executive function of administrative agencies." Mazza v. Bd. of Trs., Police & Firemen's Ret. Sys., 143 N.J. 22, 25 (1995).

Generally, an agency decision will be upheld "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Saccone v. Bd. of Trs., Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)). In determining whether agency action is arbitrary, capricious, or unreasonable, our role is restricted to three inquiries:

> (1) whether the agency action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings upon which the agency based application of legislative policies; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors.

[R.S. v. Div. of Med. Assistance and Health Servs., 434 N.J. Super. 250, 261 (App. Div. 2014) (quoting H.K. v. Div. of Med. Assistance and Health Servs., 379 N.J. Super. 321, 327 (App. Div. 2005)).]

"When an agency's decision meets those criteria, then a court owes substantial deference to the agency's expertise and superior knowledge of a particular field." In re Herrmann, 192 N.J. 19, 28 (2007). "The burden of demonstrating that the agency's action was arbitrary, capricious[,] or unreasonable rests upon the person challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006); see also Lavezzi v. State, 219 N.J. 163, 171 (2014).

"Where there is substantial evidence in the record to support more than one regulatory conclusion, it is the agency's choice which governs." In re Adoption of Amends. to Ne., Upper Raritan, Sussex Cnty., 435 N.J. Super. 571, 583 (App Div. 2014) (quoting Murray v. State Health Benefits Comm'n, 337 N.J. Super. 435, 442 (App. Div. 2001)). "If the Appellate Division is satisfied after its review that the evidence and the inferences to be drawn therefrom support the agency head's decision, then it must affirm even if the court feels that it would have reached a different result itself." Id. at 584 (quoting Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 588 (1988)).

The UCL "was designed to act as a cushion 'against the shocks and rigors of unemployment.'" East Bay Drywall, 251 N.J. at 494 (quoting Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Lab., 125 N.J. 567, 581 (1991)). Whether a putative employer is required to pay into the UCDB fund under N.J.S.A. 43:21-7 turns on whether its workers are employees or independent contractors. Id. at 484-85. Importantly, "[b]ecause the statute is remedial, its provisions have been construed liberally, permitting a statutory employer-employee relationship to be found even though that relationship may not satisfy common-law principles [of employment]." Id. at 494 (second alteration in original) (quoting Carpet Remnant, 125 N.J. at 581).

Accordingly, any service performed for remuneration under an express or implied contract is presumed employment unless the statutory ABC test is satisfied. Id. at 495. "Remuneration" is defined as "all compensation for personal services, including commission and bonuses and the cash value of all compensation in any medium other than cash." N.J.S.A. 43:21-19(p). Once personal services have been established, any form of payment made in exchange falls "squarely within the statutory definition of remuneration." Gilchrist v. Div. of Emp. Sec., Dep't of Lab. & Indus., 48 N.J. Super. 147, 156 (App. Div. 1957).

The statutory ABC test provides:

Services performed by an individual for remuneration shall be deemed to be employment . . . unless and until it is shown to the satisfaction of the division that:

> (A) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact;
>
> (B) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and
>
> (C) Such individual is customarily engaged in an independently established trade, occupation, profession[,] or business.

[N.J.S.A. 43:21-19(i)(6)(A) to (C).]

Because the ABC test is formulated in the conjunctive and presumes services for remuneration constitute employment, the party challenging the Department's determination of an employer-employee relationship has the burden of "establish[ing] the existence of all three criteria." East Bay Drywall, 251 N.J. at 495 (quoting Carpet Remnant, 125 N.J. at 581). The ABC test "is fact-sensitive, requiring an evaluation in each case of the substance, not the form, of the relationship." Id. at 496 (quoting Carpet Remnant, 125 N.J. at 581).

"The factfinder must look beyond the employment contract and the payment method to determine the true nature of the relationship." Ibid.

For example, in Koza, we determined a bandleader was not the employer of musicians who sporadically played together because the bandleader only received money from the club owner and distributed it among the musicians. 307 N.J. Super. at 444. We concluded the bandleader "[wa]s merely acting as a conduit in distributing the 'remuneration' paid to the group by the club owner." Ibid. In that context, the arrangement was akin to a joint venture rather than an employer-employee relationship. Ibid.

III.

With those principles in view, we reject ZJN's resurrected, albeit brief, argument that the ABC test under the UCL is inapplicable because its DJ entertainers did not provide services for remuneration. Unlike the arrangement in Koza, Rosenzweig did not work with the DJs at their events; the DJs performed individually. The DJs provided their entertainment services to ZJN's clients, ZJN paid the DJs for rendering those services, and ZJN provided the DJs with Forms 1099 to reflect the payment. ZJN's payment process "f[ell] squarely within the definition of remuneration." See Gilchrist, 48 N.J. Super. at 156.

A-3983-23

We therefore turn to the Commissioner's findings under the ABC test. ZJN argues it established all three prongs of the test and, as such, appropriately classified its DJs as independent contractors. We address each prong seriatim.

A.

Prong A, known as the "control test," "requires a showing that the provider of services 'has been and will continue to be free from control or direction over the performance of such services.'" Carpet Remnant, 125 N.J. at 582 (quoting N.J.S.A. 43:21-19(i)(6)(A)). The party challenging the Department's finding "must establish not only that the employer has not exercised control in fact, but also that the employer has not reserved the right to control the individual's performance." Ibid. "An employer need not control every facet of a person's responsibilities, however, for that person to be deemed an employee." Ibid. The "entire relationship" between the purported employer and worker must be evaluated. Id. at 590. Factors to consider include: "whether the worker is required to work any set hours or jobs, whether the enterprise has the right to control the details and means by which the services are performed, and whether the services must be rendered personally." Ibid.

In the present matter, to support his decision that "the overwhelming weight of the evidence in the record supports the conclusion that the DJs were

13

not free from control or direction over the performance of their work," the Commissioner cited the following testimony:

> (1) ZJN advertises the availability of its DJs to perform at events, (2) ZJN receives calls or emails from prospective customers to provide DJ services, (3) ZJN contacts the prospective customers and negotiates all of the details of the "gig," including the price, (4) ZJN contracts with its customers for the performance of the DJ services, (5) ZJN secures down payments and final payments from its customers, (6) ZJN decides which of its DJs to offer a "gig," (7) ZJN provides a replacement if one of its DJs cannot make a "gig," (8) ZJN pays its DJs directly for the performance of services, and finally, (9) ZJN vets all prospective DJs before engaging them to work; conducting interviews, asking for references and attending events to ensure that the prospective DJs' performances are up to ZJN's standards.

On appeal, ZJN counters the testimony adduced at the hearing demonstrated the DJs: purchase and supply their own equipment; were free to work independently or for other companies; did not sign non-compete or non-solicitation agreements; were "completely independent regarding their fees, performance and actions"; and were solely responsible for handling the customers "based upon their personal interaction with them." Accordingly, ZJN claims the company established the first prong.

We recognize ZJN's arguments as to prong A are not without some merit. Similar to the carpet installers in Carpet Remnants, the record reflects the DJs

14

were free to accept or reject a job, could work independently or for other agencies, and were not supervised during their performances. See 125 N.J. at 590-91. In addition, the DJs negotiated the details of their performance directly with clients, were not trained by ZJN, and provided their own equipment.

Nonetheless the record reveals ZJN exercised some control over the DJs' work. For example, ZJN established the specific times and dates of the performances and expected the DJs to perform the work themselves. Even if the record contains substantial evidence "to support more than one regulatory conclusion," however, "it is the agency's choice which governs." In re Adoption of Amends., 435 N.J. Super. at 583 (quoting Murray, 337 N.J. Super. at 442). Because there was ample evidence in the record to support the Commissioner's prong A findings, we conclude those findings were not arbitrary, capricious, or unreasonable.

## B.

The second part of the ABC test addresses whether the services rendered were "either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed." N.J.S.A. 43:21-

A-3983-23

19(i)(6)(B). Proof of either "alternative[] is a prerequisite for avoiding designation as an employee." Carpet Remnant, 125 N.J. at 584.

Regarding the first part of prong B, in Carpet Remnant, our Supreme Court declined to define the term "usual course of business." 125 N.J. at 584-85; see also East Bay Drywall, 251 N.J. at 496 n.3 (suggesting the Department promulgate regulations clarifying "what constitutes the 'usual course of the business'" in light of the modern prevalence of remote work).

As to the second part of the prong, the Court in Carpet Remnant interpreted the provision, "the places of business of the enterprise," as stated in the statute, to include "only to those locations where the enterprise has a physical plant or conducts an integral part of its business." Id. at 592. In doing so, the Court rejected the Commissioner's determination that a carpet retailer's "places of business 'may broadly be said to extend to every geographical point of installation.'" Ibid. The Court explained, "[u]nder that definition of 'places of business,'" satisfaction of prong B's "second alternative would be practically impossible." Ibid.

Here, citing Carpet Remnant, the Commissioner determined:

> [S]ince the principal part of [ZJN]'s business enterprise is the performance of DJ services, pursuant to the contracts that ZJN maintained with its customers, the venues where those DJ services were performed are

16

locations where ZJN conducts an "integral part of its business." Similarly, . . . since the principal part of [ZJN]'s business enterprise is the performance of DJ services, the performance of DJ services by the DJs engaged by ZJN to satisfy [ZJN]'s obligations and responsibilities under the contracts with its customers were services performed within, not outside of, [ZJN]'s usual course of business.

ZJN argues its "usual course of business . . . is the booking of events," which the record demonstrates, were performed at Rosenzweig's home office. Further, "ZJN has no ownership, lease, interest[,] or control over" any of the event venues. ZJN therefore argues the DJs' work was performed outside its place of business and outside its usual course of business.

As to the first part of prong B, the evidence demonstrates the DJ services clearly were within the course of ZJN's business. ZJN's Schedule C and business registration application classify the business as a "disc jockey service." Thus, the issue concerning prong B is whether ZJN established the DJs' work was performed outside its "place of business."

It is undisputed the DJs' work occurs at the client's venue, not a physical location owned by ZJN. The Commissioner deemed the venues "places of business" reasoning an integral part of ZJN's business was the DJ's performance. Such an expansive interpretation of "places of business" would make it "practically impossible" for ZJN to prove this portion of the second prong in the

17

context of a DJ services business.  See ibid.  Indeed, the Commissioner's determination that the clients' venues were places of business is akin to the "every geographical point of installation" definition rejected by our Supreme Court in Carpet Remnant.  See ibid.

Based on our review of the record, the Commissioner's determination on the second part of prong B is at odds with the Court's reasoning in Carpet Remnant.  We therefore conclude the agency's interpretation of "places of business" for purposes of the second prong is overly broad, and thus unreasonable.  See Saccone, 219 N.J. at 380.  Nonetheless, prevailing on one prong of the ABC test is insufficient to entitle ZJN to relief.  See East Bay Drywall, 251 N.J. at 495; Carpet Remnant, 125 N.J. at 581.

C.

The final prong of the three-part test requires a showing that the worker "is customarily engaged in an independently established trade, occupation, profession[,] or business."  N.J.S.A. 43:21-19(i)(6)(C). "[T]he [prong] C standard is satisfied when a person has a business, trade, occupation, or profession that will clearly continue despite termination of the challenged relationship." East Bay Drywall, 251 N.J. at 497 (second alteration in original) (quoting Carpet Remnant, 125 N.J. at 586).  Importantly, "[t]he present tense of

18

the verb, 'is,'" as used in the statute, "indicates that the employee must be engaged in such independently established activity at the time of rendering the service involved." Gilchrist, 48 N.J. Super. at 158. "If the worker 'would join the ranks of the unemployed' when the relationship ends, the worker cannot be considered independent under prong C." East Bay Drywall, 251 N.J. at 497 (quoting Carpet Remnant, 125 N.J. at 585-86). Our Supreme Court has noted, however, "even wholly dependent employees may choose to work for more than one employer." Id. at 498.

A non-exhaustive list of the relevant factors includes: "the duration and strength of the [worker]s' businesses, the number of customers and their respective volume of business, the number of employees, and the extent of the [worker]s' tools, equipment, vehicles, and similar resources." Carpet Remnant, 125 N.J. at 593. The amount of remuneration received from the putative employer compared to other sources is another important consideration. Ibid.

In the present matter, the ALJ determined ZJN met prong C only for Clemmons and Geist, but failed to present sufficient evidence for the remaining DJs. The ALJ concluded "Clemmons and Geist viewed ZJN as a booking agency" and engaged in business independently from ZJN because they had DJ businesses and full-time jobs outside their work with ZJN. The Commissioner

19

A-3983-23

disagreed, finding Clemmons's employment as a pit manager and Geist's work as a home inspector, "in addition to the work that they perform for ZJN, is not evidence that either man was customarily engaged in an independently established business enterprise during the audit period, but rather, is evidence of multiple covered employment." Accordingly, the Commissioner determined ZJN did not meet prong C for any of the DJs.

ZJN maintains:  all the DJs "have their own full and part time businesses and/or careers"; "performances booked through ZJN is part-time side work"; many DJs "have made substantial economic investments into their businesses," including "audio equipment, music[,] and related necessities"; the DJs testified "they deduct [their] investments as business expenses on their tax returns as ordinary and necessary expenses of their business"; the DJs "are not paid an hours wage" and "[t]heir fees are negotiated, per event"; ZJN does not reimburse the DJs "for work[-]related expenses"; "[e]ach job is completed on the day of the event," ending the relationship with ZJN until the DJ decides to accept another job; and the DJs "have the right of refusal for any offered job"; the DJs use services of other booking agencies; and the loss of jobs booked through ZJN "would not significantly impact their financial situation[,] or necessitate an application for unemployment benefits."

20

ZJN offered little evidence to demonstrate the DJs operated a truly independent business during the audit period. The Commissioner did not disturb the ALJ's finding that "[m]ost of [ZJN's Form] 1099 recipients failed to return the [auditor's] questionnaires and failed to provide their Schedule C tax filings." Accordingly, the record before the Commissioner was devoid of any evidence demonstrating the compensation the DJs received from ZJN compared with their other sources of income. Nor did ZJN produce documentary evidence of the DJs' insurance, business registration, or contracts between the DJs and their clients. Instead, the record demonstrates ZJN advertised the DJs' availability on their website; negotiated the details of each event with prospective customers; contracted with the customers; vetted prospective DJs; replaced the DJs if they were unable to perform at an event; and paid the DJs directly.

Although Clemmons and Geist testified at the hearing, ZJN did not produce sufficient documentary evidence establishing they had independent DJ businesses. As the Court recognized in Carpet Remnants, "[a]lthough the record contain[ed] testimony that carpet installers generally provide services for several retailers and are not financially dependent on one retailer, that evidence [wa]s not sufficient to satisfy the C criterion." 125 N.J. at 592. Nor did ZJN provide documentary evidence establishing "the amount of remuneration each

21

[DJ] received from [ZJN] compared to that received from other [DJ brokers]." Id. at 593; see also East Bay Drywall, 251 N.J. at 499-500 (finding "little or no documentary evidence" to support a prong C finding).

On this record, ZJN failed to provide sufficient evidence to satisfy prong C. We therefore conclude ZJN failed to make a "clear showing" that the Commissioner's findings were "arbitrary, capricious, or unreasonable," see Saccone, 219 N.J. at 380, and the agency's final decision "is supported by sufficient credible evidence on the record as a whole," R. 2:11-3(e)(1)(D).

To the extent not addressed, ZJN's remaining contentions lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hasley

Clerk of the Appellate Division

A-3983-23