**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1529-21

MICHAEL BERGIN,

     Petitioner-Appellant,

v.

NEW JERSEY DEPARTMENT
OF LABOR AND WORKFORCE
DEVELOPMENT,

     Respondent-Respondent,

and

EQUITY NATIONAL CAPITAL, LLC,

     Petitioner,

v.

NEW JERSEY DEPARTMENT
OF LABOR AND WORKFORCE
DEVELOPMENT,

     Respondent.

_____

Argued November 8, 2023 – Decided January 16, 2024

Before Judges Whipple, Mayer and Enright.

On appeal from New Jersey Department of Labor and Workforce Development, Docket Nos. 13-015 and 13-016.

Timothy W. Bergin (Potomac Law Group, PLLC) of the Virginia bar, admitted pro hac vice, argued the cause for appellant (Law Office of Mark A. Kriegel, LLC, and Timothy W. Bergin, attorneys; Mark A. Kriegel and Timothy W. Bergin, on the briefs).

Kevin K.O. Sangster, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Donna Sue Arons, Assistant Attorney General, of counsel; Kevin K.O. Sangster, on the brief).

PER CURIAM

Michael Bergin appeals from a December 16, 2021 final administrative action of the Commissioner of the New Jersey Department of Labor and Workforce Development (the Department) requiring Bergin, as sole member of Equity National Capital, LLC (ENC), to pay employee-related tax assessments in the amount of $110,401.36, plus interest and penalties, for the years 2007 through 2011 for financial brokers with whom he claimed he retained a supplier/customer and landlord/tenant relationship. We affirm.

The record informs our decision. In 2006, Bergin, a licensed securities broker, entered into an Office of Supervisory Jurisdiction (OSJ) agreement

A-1529-21

with J.P. Turner, LLC (JPT), a securities broker-dealer. In that OSJ agreement, JPT appointed Bergin as its licensee to open, manage, and operate a general securities business; in return, JPT would fulfill certain obligations to Bergin and to the registered brokers/representatives whom Bergin appointed. This was to occur at the Red Bank branch of JPT and would be conducted in accordance with the OSJ agreement.

The OSJ agreement stated Bergin was JPT's independent contractor. All individuals engaged by Bergin would be Bergin's employees or agents, and JPT would not be responsible for them. Per their agreement, JPT would have no right to control or direct JPT's licensee (Bergin), other than according to the terms of the OSJ agreement and to the extent required by law to oversee compliance with rules of relevant authorities, such as the Securities Exchange Commission and National Association of Securities Dealers.

Under the OSJ agreement, Bergin was to "perform all of the duties typically performed by a branch office manager of a retail-securities firm," including "[h]iring, supervising[,] and terminating, as appropriate, all persons working at, conducting business for, or associated with" the Red Bank branch office and ensuring that branch office brokers abided by all regulations. JPT retained the authority to approve such hiring decisions. Bergin was to pay the

3

brokers through the Commission Schedule provided to JPT by Bergin, pursuant to Section 4(d) of the OSJ agreement. The OSJ agreement included a provision whereby Bergin was to pay the brokers with "forgivable loans," to be repaid over time—without interest—by deductions from monthly commission payments.

Bergin began acquiring brokers. These new brokers would typically accept the terms of their service in three documents: (1) a Registered Representative (RR) Agreement; (2) a Memorandum of Understanding (MOU); and (3) a promissory note.

Each broker, "engaged by licensee" as a registered representative, was to "conduct his or her business as a securities broker" exclusively through JPT, and the broker was to process all orders qualifying as "securities transactions" through JPT. As the licensee, Bergin provided office facilities and supplies. JPT was not obliged to provide any administrative services or to house the brokers. JPT was only to buy and sell orders of approved securities and maintain records. In addition, each broker guaranteed that no order would go to a JPT trading desk without signed approval by Bergin. New registered brokers also signed an MOU with ENC which stated the broker was an independent contractor.

4

When a broker from JPT's branch office in Red Bank sought benefits under Unemployment Compensation Law (UCL), N.J.S.A. 43:21-1 to -71, in April 2008, it triggered scrutiny by the Department because the broker was not on the ENC payroll. The Department sought to determine whether the Red Bank branch office was an employer required to make regular contributions to the New Jersey Unemployment Compensation Fund (UCF). Anthony M. Miele [1] of the Department conducted an audit of Bergin and ENC for contribution years 2007 through 2010 and determined there was a contribution deficiency in the amount of $74,963.92 from ENC and $110,401.36 from Bergin.

Miele found the brokers worked on-site—using equipment provided to them—and were selling securities; under the conditions he observed, the brokers were not considered outside sellers. Miele found Bergin—the sole principal member of ENC—had listed brokers and their commissions on his income tax returns using his own social security number, even though he had issued them 1099 forms. Also, the brokers had not been compensated

---

[1] Miele conducted the on-site audits; once Miele retired, however, he was unavailable to testify.

A-1529-21

exclusively through commissions, as the payments to them were in the form of "forgivable loans."

Miele rejected assertions offered by Edgar D. Gee, CPA for Bergin and ENC, regarding exemptions under Sections 3401 and 3508 of the Internal Revenue Code and N.J.S.A. 43:21-19(i)(7)(J). Miele also rejected the assertion the brokers' payments were protected by the federal "safe harbor" provisions and examined the status of the brokers through application of the "ABC" test under New Jersey law.[2] Bergin and ENC disagreed with his findings, so Miele performed a second audit; his conclusions remained unchanged: the brokers were not true independent contractors, ENC had a contribution deficiency of $74,963.92 for the years of 2007 through 2010, and Bergin similarly owed $110,401.36 for the same years.

In September 2011, pursuant to UCL §14(c), ENC and Bergin—the only member of ENC—were assessed UCL taxes from January 2007 through March 2011 to cure the deficiencies. Both petitioned the Office of Administrative Law (OAL) and filed a joint motion for summary decision in the OAL proceedings.

---

[2] "ABC" is a reference to the test in N.J.S.A. 43:21-19(i)(6)(A), (B), and (C). E. Bay Drywall, LLC v. Dep't of Labor & Workforce Dev., 251 N.J. 477, 495 (2022).

In 2017, Administrative Law Judge (ALJ) Lisa James-Beavers denied the joint motion for summary decision but later granted a motion for reconsideration in part, holding that, under UCL § 19(g) and the Revised Uniform Limited Liability Company Act, N.J.S.A. 42:2C-92, Bergin was not liable for the Department's assessment against him. The Department's Commissioner vacated that decision, ordering an evidentiary hearing be held. ALJ James-Beavers conducted an evidentiary hearing on the consolidated matters in January 2019.

Two witnesses testified. The Department's witness was Supervising Auditor David Menist, who examined Bergin's records and confirmed Miele's audit. Menist testified the investigation and audit of Bergin occurred when the Department learned that ENC is not a licensed entity and cannot pay commissions. Consequently, the Department decided to audit ENC's sole member, Bergin, who is fully licensed to pay commissions.

Menist discussed Miele's findings and concluded Bergin was not entitled to an exemption under N.J.S.A. 43:21-19(i)(7)(J), because "employment" is a precondition under that section. Miele had found that not all the brokers were compensated entirely on a commission basis, as some were paid using the "forgivable loan" structure. Menist agreed, based on the audit materials,

7

Bergin failed to establish a statutory exemption under the Federal Unemployment Tax Act (FUTA) and did not provide the proofs required by N.J.A.C. 12:16-23.2, which would also provide shelter from the UCL tax. Menist also explained why the other exemptions were inapplicable. For example, the federal "safe harbor" provision is not preemptive in New Jersey and, based on Miele's audit, the "direct sellers" defense is inapplicable to securities sales.

Menist testified Miele's audit showed that ENC failed to meet its burden of establishing that the brokers in the franchise did not satisfy the ABC test, in that they: (a) were not demonstrably outside the control of ENC; (b) were not shown to be employed outside the ordinary course of ENC's business; and (c) were not shown to be individually and independently operating their own businesses. For instance, while the brokers relied on Bergin to make trades, Bergin relied on JPT to make the trades. In addition, Bergin disbursed the payment of commissions to the brokers from his own funds and charged for the office administrative services he provided to them. These, with other factors, led to Menist's conclusion that Bergin retained an employer-employee relationship with the brokers under the ABC test.

8

A-1529-21

Menist concluded the brokers involved in the business were conducting sales of securities in the normal course of Bergin's business, and the brokers were not independently established in a separate trade. He found a contribution deficiency of $88,391.64 and a recorded liability amount of $436,815.81.

The next witness was Bergin, who testified that he issued 1099s to the brokers. Bergin recounted how he was unpleasantly surprised, within the first year of his relationship with JPT, to learn that JPT was issuing to him—as licensee—a 1099 form for the entire amount received by the Red Bank branch, including brokers' commissions issued separately from JPT. For example, of the 3.5 million dollars credited to him, Bergin testified that 2.7 million dollars had been received by the Red Bank branch's registered representatives.

Because he was dissatisfied with the arrangement with JPT, Bergin consulted with Gee, who advised him the arrangement was legal. Gee began administratively issuing 1099 forms to the brokers for the commissions they received, notwithstanding JPT's payment of commissions they had already earned. Bergin understood that a 1099 form is issued to a contractor to disclose non-wage compensation and that a W-2 form is issued to memorialize wages.

A-1529-21

According to Bergin, the brokers were autonomous, he could only recommend hiring and firing of brokers to JPT, and he could not hire and fire brokers himself. There was no dress code at the Red Bank branch, and the brokers were accorded freedom of movement; each broker could independently operate upon his or her choosing.

When ALJ James-Beavers was elevated to the Superior Court before rendering her written decision, OAL Deputy Director and Administrative Law Assignment Judge (ALAJ) Edward J. Delanoy, Jr.—with the parties' consent—issued an initial decision based on the record, without a new hearing. ALAJ Delanoy made the following additional findings of fact when issuing the initial decision:

> 1. [JPT], after deducting its percentage of [nine] percent, sent the remainder of each commission it received from the [b]ranch [o]ffice brokers to Bergin.
>
> 2. Bergin, after calculating and deducting his variable percentage, disbursed the remainder to the branch office brokers. He issued 1099 forms to each broker with his social security number, and claimed the commission expenses on his personal income tax returns.
>
> 3. The registered representatives/brokers provided their services on the premises of the Red Bank branch office.

A-1529-21

A preponderance of evidence is generally the standard of proof applied in administrative law contested cases before state agencies. Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 169 (2006). As such, ALAJ Delanoy found Bergin and ENC did not present sufficient proof to demonstrate by a preponderance of the evidence the conditions set forth in the exemption under N.J.S.A. 43:21-19(i)(7)(J) existed in the Red Bank branch. He determined "[i]t is more likely than not that the brokers were not free from control or direction over the performance of their services, both by contract and in fact." The ALAJ also found that Bergin, but not ENC, was liable for the unpaid contributions. As a result, the initial decision affirmed the Department's assessment against Bergin but reversed the assessment against ENC. Thus, the initial decision dismissed Bergin's appeal and granted ENC's appeal.

The ALAJ also found, by a preponderance of the evidence, that the brokers received "remuneration," which is defined as "all compensation for personal services." N.J.S.A. 43:21-19(p). As the ALAJ explained:

> [G]iven the clearly express language in the UCL, that through commissions which are not the exclusive source of brokers' incomes, and through the monies given the brokers in promissory notes styling them as "forgivable loans," the brokers hired in the Red Bank branch were in fact receiving "remuneration" as defined above. Consequently, their services must be

11

considered "employment," not independent contracting.

It is not credible for petitioners to suggest that routinely forgiving "loans" to newcomer brokers, on a regular, scheduled monthly payback . . . is somehow in the nature of a signing bonus. The arrangement lasts years. The years coincide with the length of each of the brokers' contracts of employment in the branch. Repeatedly labeling the brokers in the language of these agreements as "independent contractors" does not per se confer that status. It must be determined that this language does not succeed, given the cumulative weight of circumstances found in this record.

Next, the ALAJ determined Bergin failed to demonstrate the ABC test set forth under N.J.S.A. 43:21-19(i)(1) had been satisfied. Specifically, with respect to Section A of the test, the ALAJ noted:

Bergin argues that the funds to brokers were not distributed by him. He issued the 1099 forms to accommodate the pressuring insistence of JPT. Further, his accountant, Gee, had assured him the process was simply an acceptable accounting device. However, without testimony from Gee or any corroboration by the brokers, and considering the OSJ [agreement]'s clear conferral of responsibility for commission disbursement on Bergin, this argument must fail. Who holds the purse is the controlling factor.

Regarding Section B of the test, ALAJ Delanoy found Miele

credibly and consistently reported that the brokers were present on the premises and under the aegis of

12

the Red Bank branch office when performing their services. Against the background of those reasons outlined above, finding that the brokers had direction and control by Bergin, the evidence preponderates that the brokers were employed in the [b]ranch [o]ffice selling securities on behalf of Bergin and JPT, in the usual course of business. They did not operate outside the places where the usual course of business was performed.

As to Section C of the test, ALAJ Delanoy noted the "boundaryless environment" in the Red Bank branch office did not rise to the level of independent operation.

Based on those findings, and given Bergin and ENC's failure to sustain their burden of demonstrating by a preponderance of the evidence that the conditions set forth under N.J.S.A. 43:21-19(i)(6)(A)-(C) were satisfied, the ALAJ found Bergin and ENC did not fall within the purview of N.J.S.A. 43:21-19(i)(7)(J)'s exemption

The ALAJ next addressed Bergin's contention that a corresponding exemption exists within FUTA, in Section 921 of the Taxpayer Relief Act of 1997, codified as a note following 26 U.S.C. § 3121. However, the ALAJ stated it was "unclear how this section applies to services of the branch office brokers, where employer control is not limited to compliance with securities rules." Section 921 "does not provide a defined, corresponding exemption in

13

FUTA, as anticipated in N.J.A.C. 12:16-23.1 and N.J.A.C. 12:16-23.2, or N.J.S.A. 43:21-19(i)(7)(J)."

ALAJ Delanoy also rejected Bergin and ENC's interrelated, alternative theories of exemption that: (1) they were entitled to the FUTA "direct sellers" exemption under 26 U.S.C. § 3508(b)(2); and (2) the brokers were not subject to tax because of the "safe harbor" provision under Section 530 of the Revenue Act of 1978 (codified as a note to 26 U.S.C. § 3401). Rejecting the applicability of the "direct sellers" exemption, the ALAJ wrote:

> The brokers here have been credibly shown by respondent to be operating primarily from the branch office premises, and to be using a JPT securities platform to transact sales. Nothing in the record suggests this business is, or could be, conducted home-to-home through in-home demonstration. Therefore, I CONCLUDE that the "direct sellers" exemption does not apply, and the services of the branch office brokers cannot be exempted by reliance on FUTA.
>
> [(Emphasis in original.)]

The ALAJ also rejected application of the "safe harbor" exemption under the UCL, stating that N.J.A.C. 12:16-23.2(a) "specifically precludes use of this safe-harbor provision as evidence of FUTA exemption." The ALAJ did not definitively rule on Bergin and ENC's argument that N.J.A.C. 12:16-23.2(a)(4) should be applied retroactively to their benefit. Until its amendment in 2018,

14

this rule had defined services by brokers as comporting with the Internal Revenue Service (IRS) guidelines for establishing the FUTA exemption for independent contractors. Instead of addressing the outdated definition, the ALAJ determined the Department could rely on the current version of the rule, retroactively applied.

Finally, the ALAJ found Bergin and ENC—rather than JPT—were correctly considered the brokers' employers, as stated in the OSJ agreement. To that end, the ALAJ noted the Department had not audited or otherwise identified JPT as a party, and there would be a fundamental due process concern if JPT was classified as the employer without a chance to respond or litigate its case.

The Department's Commissioner adopted the findings and rationale of the ALAJ regarding the ABC test into the final administrative action. After reiterating the ALAJ's findings with respect to those three prongs, the Commissioner concluded:

> Upon de novo review of the record, and after consideration of the ALAJ's initial decision, as well as the exceptions filed by petitioner Bergin, I hereby accept and adopt the findings of fact, conclusions[,] and recommendation contained in the ALAJ's initial decision.

15

The Commissioner, therefore, ordered Bergin to immediately remit $110,401.36—reflecting his liability for years 2007 through 2011—as well as applicable interest and penalties, to the Department. At that time, the Commissioner also dismissed the Department's assessment against ENC. This appeal followed.

On appeal, Bergin argues he was not the employer of the Red Bank branch office brokers under the UCL. We reject that argument and—under our limited standard of review—affirm, largely for the extensive discussion and findings of ALAJ Delanoy. We add the following.

"Appellate review of an agency's determination is limited in scope." Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 9 (2009); N.J. Ass'n of Sch. Adm'rs v. Cerf, 428 N.J. Super. 588, 595 (App. Div. 2012). "Judicial review of agency regulations begins with a presumption that the regulations are both 'valid and reasonable.'" N.J. Ass'n of Sch. Adm'rs v. Schundler, 211 N.J. 535, 548 (2012) (quoting N.J. Soc'y for the Prevention of Cruelty to Animals v. N.J. Dep't of Agric., 196 N.J. 366, 385 (2008)). "Unless a [c]ourt finds that the agency's action was arbitrary, capricious, or unreasonable, the agency's ruling should not be disturbed." I.G. v. Dep't of

Hum. Servs., 386 N.J. Super. 282, 286 (App. Div. 2006) (quoting Brady v. Bd. of Rev., 152 N.J. 197, 210 (1997)).

We also generally defer to an administrative agency's role in factfinding. See Messick v. Bd. of Rev., 420 N.J. Super. 321, 325 (App. Div. 2011) (Reviewing courts defer to an administrative agency's "technical expertise, its superior knowledge of its subject matter area, and its fact-finding role.").

The UCL, is "social legislation that provides financial assistance to eligible workers suffering the distress and dislocation caused by unemployment." Utley v. Bd. of Rev., 194 N.J. 534, 543 (2008). "At the center of the UCL is the employer-employee relationship." Phila. Newspapers, Inc. v. Bd. of Rev., 397 N.J. Super. 309, 318-19, (App. Div. 2007).

Under the UCL, payments to qualified unemployed persons "are made out of a fund which is financed by contributions thereto by employers and workers based on the wages paid and received as specified in the law." Bloom v. Div. of Emp. Sec., 69 N.J. Super. 175, 178 (App. Div. 1961). Both employers and employees are required to make contributions to the fund. N.J.S.A. 43:21-7. If, however, an employer fails to deduct the contributions of any of his employees at the time wages are paid, only the employer is liable to the fund for such contributions. N.J.S.A. 43:21-7(d)(1)(E).

A-1529-21

Once the Department determines an employer-employee relationship exists, the party challenging the Department's determination has the burden of showing otherwise. N.J.S.A. 43:21-19(i)(6). Under that framework, the putative employer—here, Bergin—must establish the existence of the three criteria under what is now known as the ABC test. Ibid. N.J.S.A. 43:21-19(i)(6)(A), (B), and (C) provide as follows:

> Services performed by an individual for remuneration shall be deemed to be employment subject to this chapter [(N.J.S.A. 43:21-1 to -71)] unless and until it is shown to the satisfaction of the division[3] that
>
> > A) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact;
> >
> > (B) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and
> >
> > (C) Such individual is customarily engaged in an independently established trade, occupation, profession[,] or business.

---

[3] "'Division' means the Division of Unemployment and Temporary Disability Insurance of the Department of Labor and Workforce Development." N.J.S.A. 43:21-19(e)(1).

[Ibid.]

All three provisions must be satisfied under this test; an entity that fails to prove even one of the elements is considered an employer under the UCL. Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Labor, 125 N.J. 567, 581 (1991); William H. Goldberg & Co. v. Div. of Emp. Sec., 21 N.J. 107, 113 (1956); Trauma Nurses, Inc. v. Bd. of Rev., 242 N.J. Super. 135, 143 (App. Div. 1990); Bloom, 69 N.J. Super. at 178-79.

Bergin argues he was not an employer but, instead, retained a supplier-customer relationship with the brokers, akin to a landlord-tenant relationship. However, this claim is not borne out by, and is contradicted by, the record. The UCL broadly defines "employment" as services "performed for remuneration or under any contract of hire, written or oral, express or implied." N.J.S.A. 43:21-19(i)(1)(A).

Bergin contends the brokers associated with the Red Bank branch office did not provide services to him and an employer-employee relationship did not exist, rather, a supplier-customer/landlord-tenant relationship was in place. Bergin contends he provided the brokers with office space, equipment, and related services, for which the brokers agreed to pay, as a monthly fee, a percentage of their gross commissions. But this assertion is belied by the fact

19

that he issued the brokers 1099 forms, and he listed those brokers and their commissions on his own income tax returns using his social security number.

As to the interrelated argument regarding the threshold requirements triggering applicability of the ABC test, Bergin contends the Department failed to demonstrate he remunerated the brokers. Instead, Bergin argues, the record establishes JPT directly paid the brokers their net commissions, which it agreed to do.

Under the OSJ agreement, Bergin was an independent contractor for JPT, and all individuals engaged by Bergin as agents were Bergin's responsibility; Bergin's duties for such individuals included "hiring, supervising and terminating, as appropriate, all persons [who] work at, conduct business for" the Red Bank branch office. Bergin also remunerated the brokers through the Commission Schedule provided to JPT by Bergin, pursuant to Section 4(d) of the OSJ agreement. In addition, as an amendment to the OSJ agreement, Bergin remunerated the brokers with "forgivable loans." Also, under the RR Agreement, the brokers were subject to various constraints at Bergin's discretion. Bergin was not solely a landlord who managed the office as JPT's agent; his attempt to classify his role as such is without merit, because the record contradicts this assertion.

20

The ALAJ found, by a preponderance of the evidence, the brokers were remunerated, and the commissions were not the sole source of their income. The brokers were provided money in the form of forgivable loans, acknowledged as such in promissory notes. The ALAJ rejected the assertion that routinely forgiving 'loans' to newcomer brokers, based on a regular, scheduled monthly payback is somehow in the nature of a signing bonus. These findings were well-supported by the record.

Bergin argues he paid the brokers as a conduit for JPT, a third party, and that JPT collected all commissions that the brokers were due from their clients. He further argues such payments did not transform him into an employer even if he issued the 1099 forms, citing Koza v. New Jersey Department of Labor, 307 N.J. Super. 439, 442 (App. Div. 1998) ("petitioner merely was the conduit for the payment of the group's earnings").

However, the facts of Koza are distinguishable. In Koza, the court held a bandleader was not the employer of musicians who sporadically played together, since the bandleader only received the money from the club owner and distributed it amongst the musicians. 307 N.J. Super. at 444. There, the court found the bandleader was a mere "conduit" for the remuneration, and, in that context, the arrangement was akin to a joint venture, instead of an

21

employer-employee relationship.  Ibid.  As discussed herein, the parties agreed that Bergin was to assert control over the brokers.  He also issued 1099 forms to them, listed the brokers and their commissions on his own income tax returns using his own social security number, and otherwise remunerated them for their work.  Thus, Koza remains distinguishable, and Bergin's argument that JPT was the employer of the Red Bank branch office brokers is meritless.

Having determined the threshold requirements of the ABC tests are applicable, the next step is to assess whether the ABC test was, indeed, satisfied.  Bergin argues he has satisfied the three sections of the ABC test, and the Department erred in finding otherwise.  Based on our review of the record, we conclude Bergin has not demonstrated the Department's determination rose to an arbitrary, capricious, or unreasonable error.

Part A of the ABC test requires a showing that the provider of services "has been and will continue to be free from control or direction over the performance of such service."  N.J.S.A. 43:21-19(i)(6)(A).  Factors showing control include:  "whether the worker is required to work any set hours or jobs, whether the enterprise has the right to control the details and means by which the services are performed, and whether the services must be rendered personally."  Carpet Remnant Warehouse, 125 N.J. at 590.

22

Part B of the test requires a showing that the services provided were "either outside the usual course of [Bergin's] business" or that the services were "performed outside of all the places of [Bergin's] business." N.J.S.A. 43:21-19(i)(6)(B). As used in the UCL, the term "place of business" refers to, among other things, those locations where the enterprise "conducts an integral part of its business." Carpet Remnant Warehouse, 125 N.J. at 592.

Part C of the test requires a showing that the putative employees were "customarily engaged in an independently established trade, occupation, profession[,] or business." N.J.S.A. 43:21-19(i)(6)(C). To satisfy Part C, a supposed employer must demonstrate that each individual is engaged in "an enterprise that exists and can continue to exist independently of and apart from the particular service relationship." Carpet Remnant Warehouse, 125 N.J. at 585. In other words, each broker would have had to conduct an "enterprise" that could have continued to exist independently from the services they performed for Bergin.

Bergin asserts the brokers were free from his control and direction, and his role was as a mere conduit for JPT, subject to JPT's control and direction; Bergin claims he was more akin to a landlord to the brokers. The OSJ

23

agreement between JPT and Bergin, as well as the MOU and RR agreements between Bergin and the brokers, undermine Bergin's arguments.

JPT appointed Bergin as its licensee to open, manage, and operate a general securities business; in return, JPT would provide "services" to Bergin and to the registered brokers who Bergin appointed. This would occur at the Red Bank branch and would be conducted in accordance with the agreement. The OSJ agreement stated Bergin would be JPT's independent contractor. All individuals engaged by Bergin as employees or agents would be Bergin's responsibility, and JPT would not be responsible for them. Per their agreement, JPT would have no right to control or direct the brokers engaged by Bergin, other than according to the terms of the OSJ agreement and to the extent required by law to oversee compliance with rules of relevant authorities. Per the OSJ agreement, Bergin's duties as licensee were to be those typical of a branch manager of a retail securities firm, including ensuring that branch brokers abided by all regulations. The proofs indicate Bergin, as ENC's sole member, monitored and controlled the brokers working out of the Red Bank branch office.

A-1529-21

The ALAJ and the Department's Commissioner properly found Parts A, B, and C of the ABC test applicable, and Bergin has failed to demonstrate how this finding was arbitrary, capricious, or unreasonable.

Bergin argues only JPT, and not he, can be considered an employer of the brokers under UCL § 19(g), which defines "employing unit" and provides:

> All individuals performing services within this State for any employing unit which maintains two or more separate establishments within this State shall be deemed to be employed by a single employing unit for all the purposes of this chapter [(N.J.S.A. 43:21-1 to -71)]. Each individual employed to perform or to assist in performing the work of any agent or employee of an employing unit shall be deemed to be employed by such employing unit for all purposes of this chapter [(N.J.S.A. 43:21-1 to -71)], whether such individual was hired or paid directly by such employing unit or by such agent or employee, provided the employing unit had actual or constructive knowledge of the work.
>
> [N.J.S.A. 43:21-19(g).]

Bergin's argument pertaining to N.J.S.A. 43:21-19(g) is two-fold: first, that he cannot be considered the brokers' employer because he was not the highest corporate authority; and second, that he cannot be deemed their employer because he purportedly did not hire and pay the brokers.

Bergin maintains, pursuant to N.J.S.A. 43:21-19(g), JPT was the highest corporate authority, and, hence, he cannot be considered the employing unit

25

under UCL. Bergin cites <u>MBL Holding Corp. v. State</u>, 215 N.J. Super. 418 (App. Div. 1987), in support of this argument, but his reliance on <u>MBL</u> is misplaced. In <u>MBL</u>, the corporations were subsidiaries of multi-line insurance carrier, MBL. 215 N.J. Super at 420. The parent corporation hired the employees, assigned them occasionally to work for the subsidiaries, and arranged for a system where the employees worked directly from the parent corporation's office. <u>Ibid.</u> MBL paid the employees and made the contributions to the UCF and "in turn billed each [subsidiary] for its share of the employee's salary and benefits." <u>Ibid.</u> The court found that, under N.J.S.A. 43:21-19(g), only MBL could be considered the employer and, therefore, liable for the unemployment contributions; MBL directly hired the employees and paid them out of MBL funds. <u>Id.</u> at 422. Only MBL exercised real control. <u>Ibid.</u> Therefore, the employees were not employed by the subsidiary corporations within the statutory definition of N.J.S.A. 43:21-19(g). The facts of this case stand in stark contrast to <u>MBL</u>.

Bergin exercised control over the brokers, remunerated them for their services—with commissions and forgivable loans—and issued them 1099 forms. The brokers performed services for remuneration, they were hired by Bergin to work under his control out of the Red Bank branch office, and they

were paid directly by Bergin for their services. Unlike the parent company in MBL, the extent of JPT's oversight was to provide that necessary to ensure the brokers' compliance with securities laws. Under N.J.S.A. 43:21-19(g), JPT cannot be considered the brokers' employer.

Moreover, as the ALAJ noted, the Department did not audit or otherwise identify JPT as a party in this case, and there would be a "fatal absence of due process" if JPT was classified as the employer without a chance to respond. This is especially pertinent at this late stage in the litigation.

Bergin similarly argues he cannot be held liable for UCL taxes as the sole member of ENC under our State's Revised Uniform Limited Liability Company Act (LLC Act), N.J.S.A. 42:2C-92. According to Bergin, ALAJ Delanoy did not have the authority under the LLC Act to hold him solely liable for the UCL taxes, rather than holding both Bergin and ENC liable, as ALJ James-Beavers had done previously.

The record is devoid of proof that ENC paid the brokers directly, and Bergin has failed to demonstrate otherwise. On the other hand, ENC did not possess a broker license; only Bergin possessed such a license. Only properly licensed entities can pay brokerage commissions.

A-1529-21

Bergin also argues he is entitled to an exemption from paying unemployment compensation under N.J.S.A. 43:21-19(i)(7)(J) and -19(i)(8). He alternatively argues he is exempt under N.J.S.A. 43:21-19(i)(7)(J) based on various corresponding federal exemptions under the FUTA, 26 U.S.C. §§ 3301 to 3311. Both arguments lack merit.

Pursuant to N.J.S.A. 43:21-19(i)(7)(J), the term "employment" shall not include

> [s]ervice performed by agents of mutual fund brokers or dealers in the sale of mutual funds or other securities . . . if the compensation to such agents for such services is wholly on a commission basis.
>
> [N.J.S.A. 43:21-19(i)(7)(J).]

According to Bergin, the brokers were only compensated with commissions, and the ALAJ's finding otherwise was erroneous. Bergin argues he presented comprehensive proofs that the loan forgiveness agreement simply provided the brokers with a higher percentage payout from their gross commissions, meaning the brokers received higher net commissions after deduction of the agreed-upon percentage fees for the so-called landlord services.

Bergin argues when ENC increased a broker's share of gross commissions generated by the broker—by means of incremental forgiveness of

a loan to the broker—the nature of the compensation to the broker as a commission was not altered, citing Yi v. Sterling Collision Centers, Inc., 480 F.3d 505, 509 (7th Cir. 2007). Yi, however, does not address the issue here. In Yi, the Seventh Circuit sought to construe the Fair Labor Standards Act (FLSA), which, like the UCL, did not define "commission." Id. at 506. Yi held that the "essence of a commission is that it bases compensation on sales, for example a percentage of the sales price," and "[i]f a team is paid a commission, [i]t has to be divided . . . and the method chosen for doing this doesn't alter the character of the compensation as a commission." Id. at 508-09. We fail to see how Yi has any bearing on this case.

N.J.S.A. 43:21-19(i)(7)(J) is inapplicable because the brokers were not solely paid commissions. As the ALAJ found, the brokers were remunerated in the form of forgivable loans.

As set forth above, Bergin is not entitled to exemptions from paying unemployment compensation under the UCL, whether directly under the UCL or under any corollary federal provisions.

Any remaining arguments raised are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1529-21